63 A.3d 647

Juan Carlos CARRERO–VASQUEZ

v.

STATE of Maryland.

No. 1443, Sept. Term, 2011.

Court of Special Appeals of Maryland.

March 21, 2013.

506

Zachary G. Parks (Kevin B. Collins, Covington & Burling LLP, Paul B. DeWolfe, Public Defender, on the brief), Washington, D.C., for Appellant.

Sarah P. Pritzlaff (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellant.

Panel: KRAUSER, C.J., MEREDITH and BERGER, JJ.

KRAUSER, C.J.

Convicted, after a jury trial in the Circuit Court for Montgomery County, of possession of cocaine with intent to distribute, as well as related weapons and traffic offenses, Juan Carlos Carrero–Vasquez, appellant, presents three issues for review. Reworded, reordered, and redacted of argument, they are:

I. Whether the trial court erred in overruling the defense's objection to the prosecutor's statement, during closing argument, that jurors should convict if their "gut says I think he's guilty";

II. Whether the trial court's order instructing the defense not to cross-examine the State's key witness, about a potential motive she had to testify falsely, violated appellant's Confrontation Clause rights under the Sixth Amendment; and

III. Whether the trial court erred in overruling the defense's objection to the jury instruction regarding the "anti-CSI effect."

Because we conclude that the trial court erred in overruling the defense's objection to the prosecutor's statement during closing argument, in prohibiting the defense from cross-examining the State's principal witness about the effect a criminal conviction might have on her immigration status, and in overruling the defense's objection to the "anti-CSI effect" jury instruction, we reverse and remand for a new trial.

## Background

Early in the morning of October 17, 2008, appellant, after a late night out with some friends, borrowed a car from one of them, a "Veronica de Luna," and drove to his mother's apartment, where he was then living. Later that evening, after leaving that apartment, appellant was pulled over, while driving Ms. Luna's car, by an Officer Michael Power of the Montgomery County Police Department, for speeding and

intentionally skidding. Unable to produce a valid driver's license, appellant handed the officer instead "an I.D. card from Mexico" in the name of "Juan Carlos Artiga–Leiva." Upon running a license check, the officer found that appellant had never been issued a valid operator's license. After another police officer arrived as "backup," appellant was asked by the two officers to step out of the vehicle, whereupon they arrested him for driving without a license.

After placing appellant in handcuffs, the officers searched him. In his right rear pocket, they found a wallet containing an I.D. card, issued by the government of El Salvador, in the name of "Juan Carlos Carrero–Vasquez," a Social Security card in the name of "Juan Carlos Artiga–Leiva," and $2,474 in cash. In his left pants pocket, they recovered "a small black grocery bag" containing "approximately 100 small plastic baggies," nine of which were filled with either cocaine or inositol, a cutting agent. Then, when police searched the vehicle appellant was driving, they found, in the center console, a loaded revolver, which was later determined to have been stolen.

Appellant was thereafter indicted for possession of cocaine with intent to distribute; possession of a regulated firearm after having previously been convicted of a disqualifying crime; sale, transfer, or disposal of a stolen, regulated firearm; wearing, carrying, or transporting a handgun in a vehicle; driving without a license; speeding; and intentionally skidding. Tried by a jury in March 2009, he was convicted of all charges. But those convictions were subsequently vacated by this Court for reasons that are unrelated to this appeal.[1] *Carrero–Vasquez v. State*, Sept. Term, 2009, No. 907 (Md.Ct. Spec.App. Oct. 6, 2009).

On remand, appellant was tried again and convicted of all charges except sale, transfer, or disposal of a stolen, regulated

---

1. In the first appeal, a panel of this Court held that there had been a violation of Maryland Rule 4–215 when, just prior to the start of trial, appellant sought to discharge his counsel. *Carrero–Vasquez v. State*, Sept. Term, 2009, No. 907 (Md.Ct.Spec.App. Oct. 6, 2009).

**510**

firearm[2] and was sentenced to a total of fifteen years' imprisonment.[3] This appeal followed.

## Discussion

### I.

We begin with appellant's claim that the trial court erred in overruling the defense's objection to the prosecutor's statement, during rebuttal, that jurors should convict if their "gut says I think he's guilty."

█ The State concluded its rebuttal by stating to the jury: The State does have a very high burden and my burden is to convince each and every one of you beyond a reasonable doubt. I am not required to prove guilty beyond all possible doubt or to a mathematical certainty. I am not required to negate every conceivable circumstance of innocence. My burden is high. I understand that. **Reasonable doubt. Trust your gut. If your gut says I think he's guilty, that's reasonable.**

(Emphasis added.)[4]

█ "The first step in our analysis is to determine whether the prosecutor's statements, standing alone, were improp-

---

**2.** The trial court granted appellant's motion for judgment of acquittal as to this count because, although the State produced testimony of the handgun's owner that it had been stolen from her, there was insufficient evidence that appellant knew or reasonably should have known of that fact.

**3.** The trial court imposed a term of fifteen years' imprisonment for possession with intent to distribute a controlled dangerous substance and to run concurrently with that sentence: four years' imprisonment for possession of a controlled dangerous substance; five years' imprisonment for possession of a regulated firearm after having been previously convicted of a disqualifying crime; and three years' imprisonment for wearing, carrying, or transporting a handgun; as well as a $100 fine for each of the three traffic offenses, which the court suspended.

**4.** Although appellant does not raise the matter before us, we feel compelled by precedent to observe that the prosecutor's rebuttal began with an improper attack on the integrity of defense counsel:

er." *Sivells v. State*, 196 Md.App. 254, 277, 9 A.3d 123 (2010), *cert. dismissed,* 421 Md. 659, 28 A.3d 704 (2011). Contrary to the State's contention that the prosecutor was only explaining to the jury how it should "assess[ ] the credibility of the witnesses," she was clearly urging the jurors to find appellant guilty beyond a reasonable doubt if their "gut" told them that he was. Not only was there utterly nothing in this comment that related this "gut" check to the jurors' assessment of witness credibility, but the comment plainly reduces proof "beyond a reasonable doubt" to a "gut" feeling.

The prosecutor's remark was clearly improper for the simple reason that it misstates the law as to reasonable doubt, an evidentiary standard that is the cornerstone of a fair criminal trial. *Ruffin v. State*, 394 Md. 355, 363, 906 A.2d 360 (2006) (observing that the "reasonable doubt standard of proof is an essential component in every criminal proceeding").

█ We turn next to the question whether the comment was harmless error, that is to say, whether we can say that the error "did not contribute to the verdict," beyond a reasonable doubt. *Lee v. State*, 405 Md. 148, 174, 950 A.2d 125 (2008). The Court of Appeals has prescribed three factors to be considered in performing a harmless error evaluation: first, the "severity of the remarks"; second, the measures taken by the trial court to cure any potential prejudice; and

---

Briefly. [Defense counsel] are criminal defense attorneys and it is their job to try to get their clients off. They're pretty good at it.
Their job is to sling mud and let's see what sticks. Sort of smoke and mirrors but they have to count on a couple of things. That you all aren't that bright and that you're easily confused.
When defense counsel objected, the trial court stated, "Overruled. Argument is not evidence."
In *Beads v. State*, 422 Md. 1, 8, 28 A.3d 1217 (2011), the prosecutor made a similar closing argument, stating to the jury that "the Defense's specific role in this case is to get their Defendants off" and that "[i]t is their job, and they do it well, to throw up some smoke, to lob a grenade, to confuse." The Court of Appeals observed that "[t]he prosecutor's comments about the role of defense counsel, although inappropriate, [were] unlikely to have 'misled or influenced the jury to the prejudice of the accused.' " *Id.* at 11, 28 A.3d 1217 (quoting *Degren v. State*, 352 Md. 400, 431, 722 A.2d 887 (1999)).

third, the weight of the evidence against the accused. *Id.* at 165, 950 A.2d 125.

 As to the first factor—"the severity of the remark"—although the prosecutor made the improper comment only once, the timing of the comment magnified its impact on the jury, as it was made at the conclusion of the State's rebuttal and was, quite literally, the last explanation the jury heard as to the weight and nature of the State's evidentiary burden.

As to the second factor—the measures taken by the trial court to cure any potential prejudice—the trial court, despite an objection to that comment by the defense, not only took no corrective measures to cure this gravely misleading remark by the State in describing its burden of proof, but overruled that objection, stating, "Closing argument is not evidence." The prosecutor then exhorted the jury, "Ladies and gentlemen, [appellant] is guilty as charged. Verdict sheet, not guilty/guilty. Check the guilty boxes." And with that, the trial court spoke briefly to the jury as to logistical matters, and then it sent the jury out of the courtroom to deliberate.

We disagree with the State's characterization of the trial court's response to appellant's objection as "caution[ary]." Nor are we swayed by the State's invocation of two instances during the trial when, in its words, "the court instructed the jury that attorneys' arguments were not evidence and that the jury's verdict must be based upon the evidence," as those remarks had nothing to do with the State's burden of proof and, in any event, were given two days before the error at issue occurred. As the Court of Appeals observed in *Lee,* for an instruction "to be sufficiently curative, the judge must instruct contemporaneously and specifically to address the issue such that the jury understands that the remarks are improper and are not evidence to be considered in reaching a verdict." 405 Md. at 177–78, 950 A.2d 125. In sum, the unmistakable effect of the trial court's actions (and inaction) was to suggest to the jury that nothing improper had occurred. *See Wilhelm v. State,* 272 Md. 404, 424, 326 A.2d 707 (1974) (observing that, "where no such [curative] action was

taken by the trial court the prejudice found to have existed were grounds for reversal").

As to the third and final factor to be considered in our determination of harmless error—the weight of the evidence against the accused—the State's case rested largely on the credibility of its witnesses, in particular, Veronica de Luna, the only witness the State had to rebut appellant's defense that the gun found in the console of the car he was driving belonged to the owner of that vehicle. And as there was no forensic evidence linking appellant to the handgun, we cannot say that the error had no influence on the jury's verdict. *See Lawson v. State,* 389 Md. 570, 600–01, 886 A.2d 876 (2005) (observing that, in a case "based primarily" on witness testimony, "there is a higher probability . . . that the prosecutor's statements had an improper impact" than in a case where "there was physical evidence of the crime along with the testimony of the police officer who witnessed the event").

Furthermore, the State's contention that there was nothing improper about the prosecutor's comments, because a juror's intuition or "gut" may reasonably be relied upon in assessing the credibility of witnesses and in resolving conflicting testimony, while perhaps true as to witness credibility, has nothing to do with the case before us, where the prosecutor suggested to the jury that it could rely on its "gut" feeling, not to resolve issues of credibility, but to decide whether there was proof beyond a reasonable doubt that appellant was guilty of the crimes charged.

And, finally, the State's reliance on *People v. Barnett,* 17 Cal.4th 1044, 74 Cal.Rptr.2d 121, 954 P.2d 384 (1998), is misplaced. Barnett was charged with murder, robbery, assault with a firearm, and kidnapping. During the guilt phase of his capital trial on those charges, the jury was given a pattern reasonable doubt instruction "which contained references to the terms 'moral evidence' and 'moral certainty.'" *Barnett,* 74 Cal.Rptr.2d 121, 954 P.2d at 456. During closing argument, the prosecutor told the jury:

"If you have that feeling, that conviction, that gut feeling that says yes, this man is guilty, he's guilty of these crimes and guilty of the robbery and guilty of the special circumstances, that's beyond a reasonable doubt."

*Id.* at 457. After Barnett was convicted of those charges and sentenced to death, he appealed, contending, among other things, that the "moral certainty" language in the pattern jury instruction, when considered in combination with the prosecutor's argument that guilt could be based on a "gut feeling," made it "reasonably likely that the jury would have misunderstood the instruction as allowing for a finding of guilt on a standard lower than proof beyond a reasonable doubt." *Id.*

The Supreme Court of California acknowledged that both it and the United States Supreme Court have expressed "reservations" about the "moral certainty" instruction but that instruction had nonetheless been upheld by both courts. *Id.* at 457.[5] It then noted that Barnett had not preserved the issue for appellate review, as he had neither raised a contemporaneous objection nor requested that the trial court give the jury "an admonition on the point." *Id.* Yet, it briefly addressed the merits of Barnett's claim, stating:

When considered as a whole, the prosecutor's argument could not have misled the jury regarding the appropriate standard of proof. The prosecutor was not purporting to define "moral certainty" as having a "gut feeling"; rather, he was directing the jurors to trust their gut feelings in assessing the credibility of witnesses and resolving the conflicts in the testimony. Shortly after making the "gut feeling" reference, the prosecutor clarified that jurors should "look beyond the mere words that have been testified to," "examine closely the various witnesses, their demeanor, their attitude," and "apply sometimes a certain intuitive

---

5. The Court of Appeals has observed that "use of the phrase 'moral certainty' has been discouraged by courts around the country," *Savoy v. State,* 420 Md. 232, 253 n. 10, 22 A.3d 845 (2011), and, consistent with that observation, the current Maryland reasonable doubt pattern instruction does not employ that expression. *See* MPJI–Cr 2:02.

reasoning to who has reasons to lie, who has not. And who to believe."

*Id.*

The California Supreme Court was further convinced that the jury had not been misled as to the prosecution's burden of proof "by the fact that the trial court had repeatedly admonished the jurors, both at the outset of trial and after closing arguments, that they were required to follow the law and base their decision solely on the law and instructions as given to them by the court." *Id.* The court concluded that Barnett had presented "no basis for reversal" and affirmed his convictions and death sentence. *Id.* at 457, 475.

*Barnett* is distinguishable from the instant case in three significant ways, rendering it of little value as analogy. First, unlike in *Barnett,* the defense, in the instant case, made a contemporaneous objection and thus there is no preservation issue. Second, unlike in *Barnett,* the State, in the instant case, made no clarifying remarks after it conflated the burden of proof with the jurors' "gut" feelings; indeed, as previously noted, the prosecutor concluded her argument after making the improper comments and the jury was sent out to deliberate. And third, unlike in *Barnett,* the trial court, in the instant case, did not instruct the jurors, after closing argument,[6] that they were required to follow the law, as instructed by the court, and that they were further required to base their verdict solely upon the law and the evidence. The circumstances of the instant case thus required the trial court to sustain appellant's objection to the prosecutor's improper remarks, to instruct the jury to disregard those remarks, and to re-instruct it as to the State's burden of proof. Its failure to take these steps constituted reversible error.

---

6. In California criminal trials, the trial court ordinarily instructs the jury after closing arguments, *see* Cal.Penal Code § 1093(e)-(f), but that court, in its discretion, may depart from that sequence. *Id.* § 1093, 1094. In Maryland, however, the trial court must "give instructions to the jury at the conclusion of all the evidence and before closing arguments." Md. Rule 4–325(a).

## II.

Appellant contends that the trial court's order, preventing the defense from cross-examining a State's witness about her immigration status and the effect that a gun conviction would have on that status, violated his right under the Sixth Amendment and Article 21 of the Maryland Declaration of Rights to confront the witnesses against him.

At appellant's first trial, Ms. Luna, the owner of the car appellant was driving when he was arrested, was called as a State's witness. During cross-examination, she testified, over the State's objection, that she was in the United States illegally and that, if she were convicted of possessing a stolen handgun, she would be eligible for deportation.

Before his second trial, appellant moved to prohibit the State from inquiring into his immigration status. The State responded by requesting that the defense, in turn, be prohibited from inquiring into Ms. Luna's immigration status. Indicating that it was inclined to grant both requests, the court stated that "if the one isn't going to mention it, neither is the other one," but it deferred ruling on the matter after the parties agreed that neither would mention the "immigration issue" in opening statements.

The following day, after two of the State's witnesses had testified, the court recessed, and Ms. Luna, an immigrant from El Salvador, who was then illegally in this country, was brought before the court. Out of the presence of the jury, she was informed by the trial court of her privilege against compelled self-incrimination and asked, through an interpreter, whether she would answer questions about her immigration status. She responded that she would not.

The court granted the State's motion to prohibit the defense from questioning her about her immigration status, stating:

Okay. Well, I think the argument has been exhausted.... And the facts in [*Calloway v. State*, 414 Md. 616, 996 A.2d 869 (2010), and *Martinez v. State*, 416 Md. 418, 7 A.3d 56 (2010),] are clearly different from the facts in this case.

And I don't think, I think it would be a stretch to try to apply the reasoning of *Calloway* and *Martinez* by analogy in this case, particularly, in light of, and the issue of Ms. Luna's immigration status, I find to be a collateral issue that is irrelevant. And there's no factual basis in this case to suggest that that's something that should be opened up. I think the problems created by doing that far exceed any probative evidence that, that causes her to be biased.

On the other hand, the handgun issue in the car, counsel can do what he can do under the rules of that, but I'm not going to allow testimony about an individual's immigration status in this case. And I want to be very clear about that, because these issues have a tendency to reemerge in other forums. And so I'm just simply not going to allow that."

The trial court continued:

And I think that, I think that this would be a dangerous road to go down, given the diversity of the population that we have in the county and in the state today.

The idea that there will be events that occur, and that sometimes, perhaps even oftentimes, depending on the locale, witnesses who are called to court to testify may even have some immigration issues, personal immigration issues, the notion that a witness comes to court and without any other factual basis for getting into that, that a witness would get on the stand and his or her immigration status would become the subject of examination, I think, is inappropriate, and I think there are some serious constitutional matters associated with that. And I think that's a bad road to start down. And this case is not going to be the first step down that road.

Thereafter, Ms. Luna testified and denied owning the handgun, which was found in her car, and further asserted that she had "[n]ever seen her children's father," who also had access to and drove the car, with the handgun. Although prohibited by the court from asking any questions about her immigration status, counsel was permitted to elicit Ms. Luna's admission that she was aware that she might "face serious conse-

quences" if she were convicted of possessing a stolen firearm or of transporting a loaded firearm.

Subsequently, during the hearing held to consider appellant's motion for new trial, the circuit court once again defended its ruling disallowing any inquiry by the defense into Ms. Luna's immigration status, stating to defense counsel:

> And you think it's error if the Court stops one from impinging on someone's constitutional right when clearly the issue being raised has absolutely nothing to do with the subject matter, whether—

Defense counsel responded in part:

> It's not an infringement on the Fifth Amendment rights to ask a question. It's infringement to be forced to answer that question.

After argument as to the motion for new trial had concluded, the trial court stated what it regarded as an additional justification for its ruling:

> With respect to the issue with Ms. Luna, the Court ruled— the Court did not allow counsel to probe into her immigration status for a lot of reasons, only one of which was the one counsel focused on, and that is, if people, witnesses in this very diverse community that we have that have various, various types of visas, various ways that they can remain here in the United States, if we open up that can of worms and allow counsel to probe into those issues when they haven't been properly generated, when it's not, not relevant at all, certainly is not error, and I don't think that any, any appellate court—if they open up that can of worms, particularly in a place like Montgomery County or Prince George's County or Washington, the Washington, D.C. area, we're going to have to open up another appellate court to deal with all of those issues that are going to come up.

Characterizing Ms. Luna as merely "a witness who happens to be an immigrant," the circuit court denied appellant's new trial motion.

 The Sixth Amendment guarantees that, in "all criminal prosecutions," the accused shall enjoy the right to be "confronted with the witnesses against him," as does Article 21 of the Maryland Declaration of Rights. " 'The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination,* ... which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.' " *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (quoting 5 J. Wigmore, *Evidence* § 1395, at 123 (3d ed. 1940) (emphasis in original)). "The constitutional right of confrontation includes the right to cross-examine a witness about matters which affect the witness's bias, interest or motive to testify falsely." *Marshall v. State,* 346 Md. 186, 192, 695 A.2d 184 (1997).

 "The right to cross-examine is not without limits, however, and 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " *Smallwood v. State,* 320 Md. 300, 307, 577 A.2d 356 (1990) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). But a trial court "must allow a defendant wide latitude to cross-examine a witness as to bias or prejudices." *Id.* at 307–08, 577 A.2d 356. In fact, the Supreme Court has instructed that the "partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' " *Davis,* 415 U.S. at 316, 94 S.Ct. 1105 (quoting 3A J. Wigmore, *Evidence* § 940, at 775 (Chadbourn rev. 1970)).

 Appellant, relying upon *Davis* and *Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (per curiam), as well as two Maryland decisions, *Calloway v. State,* 414 Md. 616, 996 A.2d 869 (2010), and *Martinez v. State,* 416 Md. 418, 7 A.3d 56 (2010), contends that his right of confrontation was violated by the trial court's ruling, which had the

effect of preventing him from cross-examining Ms. Luna as to a motive that she had to testify falsely. We agree.

In *Davis,* the Polar Bar, an Anchorage drinking establishment, was burglarized, and a safe was taken from its premises. Less than a day later, Alaska State Troopers were notified that a safe had been found about twenty-six miles from the scene of the burglary, near a home where a juvenile, Richard Green, lived with his family. *Davis,* 415 U.S. at 309, 94 S.Ct. 1105. Upon questioning by police, Green implicated Davis in the crimes. He told police that, on the day of the burglary, he had "seen and spoken with" two African–American men standing beside a car, parked along a road near his home, at the place where the safe was discovered; and that one of the men, later identified as "Davis," was holding "something like a crowbar." *Id.* at 309–10, 94 S.Ct. 1105.

Green had previously been adjudicated delinquent for committing two unrelated burglaries and was, at the time Davis was charged, on probation. *Id.* at 311, 94 S.Ct. 1105. At trial, the prosecution moved for a protective order, before Green testified, "to prevent any reference to Green's juvenile record by the defense in the course of cross-examination." *Id.* at 310, 94 S.Ct. 1105.

Although Davis's counsel "made it clear" that "Green's record would be revealed only as necessary to probe Green for bias and prejudice and not generally to call Green's good character into question," the trial court granted the prosecution's motion for a protective order, relying upon a court rule and a statute, both of which restricted the use of a delinquency adjudication in subsequent proceedings. *Id.* at 311, 94 S.Ct. 1105.

At trial, Davis's counsel "did his best to expose Green's state of mind at the time Green discovered that a stolen safe had been discovered near his home," but, because of the court's protective order, the defense was unable to challenge Green's "protestations of unconcern over possible police suspicion that he might have had a part in the Polar Bar burglary and his categorical denial of ever having been the subject of

any similar law-enforcement interrogation." *Id.* at 313–14, 94 S.Ct. 1105. Davis was convicted, and that conviction was affirmed on appeal.

The United States Supreme Court took a different view, however. After pointing out that it was "probable" that Green had undergone "some questioning" by police when he was arrested for the burglaries for which he had been adjudicated delinquent and that his denial, during cross-examination at Davis's trial, of ever having been the subject of "any similar law-enforcement interrogation" was therefore "highly suspect at the very least," the Court noted that Green "was in effect asserting, under protection of the trial court's ruling, a right to give a questionably truthful answer to a cross-examiner pursuing a relevant line of inquiry." *Id.* at 314, 94 S.Ct. 1105. It "would be difficult," opined the Court, "to conceive of a situation more clearly illustrating the need for cross-examination." *Id.* at 314, 94 S.Ct. 1105. Then, rejecting the claim that the State's interest in securing the confidentiality of juvenile records outweighed Davis's constitutional right to confront his accuser, the Court avowed that: "Whatever temporary embarrassment might result to Green or his family by disclosure of his juvenile record—if the prosecution insisted on using him to make its case—is outweighed by [Davis's] right to probe into the influence of possible bias in the testimony of a crucial identification witness." *Id.* at 319, 94 S.Ct. 1105.[7] In

---

7. The *Davis* Court, having determined that there had been a violation of the Confrontation Clause, appeared to apply a per se rule of reversal, stating that Davis "was thus denied the right of effective cross-examination which 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' *Brookhart v. Janis*, 384 U.S. 1, 3, 86 S.Ct. 1245, 16 L.Ed.2d 314." *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (quoting *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968)). Subsequently, however, in *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Court rejected this interpretation of the above-quoted language, observing that "*Davis* should not be read as establishing, without analysis, a categorical exception to the harmless-error rule," *id.* at 683, 106 S.Ct. 1431, and the Court thus held "that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to ... harmless-error analysis." *Id.* at 684, 106 S.Ct. 1431.

short, Davis's right of confrontation under the Sixth Amendment had been unconstitutionally impaired by the lower court's protective order.

In the case before us, as in *Davis,* the defense was not permitted to explore an obvious reason that an important witness for the prosecution might have to testify falsely. Keeping in mind the Supreme Court's admonition that the "partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony," *Davis,* 415 U.S. at 316, 94 S.Ct. 1105 (internal citation and quotation omitted), we reject the State's contention that Ms. Luna's immigration status was merely "a collateral issue, likely to confuse and mislead the jury." Simply because appellant's counsel was permitted to inquire into *some* reasons but not all material reasons why she may have been motivated to lie under oath left appellant with, at best, an unconstitutionally restricted right of confrontation.

A case lending even stronger support to appellant's position is *Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513, *supra.* There, the right of confrontation was compromised to avoid racial prejudice that might be elicited if the rape victim's choice of boyfriend was disclosed.

James Olden, an African–American, was charged with kidnapping, rape, and forcible sodomy of a white victim. Olden's defense was that the victim had consented to having sex with him but that she was afraid that her relationship with her live-in boyfriend, who was also African–American, would be jeopardized if it were disclosed that she had consented to having sex with Olden, so she had lied about the circumstances of their sexual contact, suggesting it was part of an assault on her by Olden.

But the trial court granted the prosecution's motion in limine to exclude any reference to the victim's living arrangement, and it sustained the prosecution's objection when defense counsel sought to cross-examine her on the matter after she had testified on direct that she had been living with her mother. *Id.* at 228–30, 109 S.Ct. 480. Olden was thereafter

convicted of forcible sodomy, and the Kentucky Court of Appeals affirmed, holding that because there were "undisputed facts of race," admitting evidence of the victim's purported cohabitation with an African–American might "have created extreme prejudice against" her. *Id.* at 231, 109 S.Ct. 480.

In summarily reversing the Kentucky appellate court, the Supreme Court observed that "[s]peculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of" the victim's testimony. *Id.* at 232, 109 S.Ct. 480. The Court found that the exclusion of relevant impeachment evidence, under the circumstances, went "beyond reason," *id.;* that Olden's Sixth Amendment right of confrontation had been violated; and that the error was not harmless. *Id.* at 233, 109 S.Ct. 480.

If speculation as to the effects of jurors' racial and ethnic biases is a wholly inadequate grounds for precluding the defense from pursuing a legitimate line of inquiry on cross-examination of a State's witness where there was a substantial motive for her to testify falsely, whatever interest the State might have in promoting diversity, including its desire to protect immigrant witnesses from intimidation and unfair prejudice, is truly subordinate to appellant's right to confront the witnesses against him.

Maryland's appellate courts have been no less emphatic in stressing that the right of confrontation is the cornerstone of a fair trial. *Martinez v. State,* 416 Md. 418, 7 A.3d 56, *supra; Calloway v. State,* 414 Md. 616, 996 A.2d 869, *supra.* Although the Court of Appeals, in *Calloway,* did not expressly rely upon the Confrontation Clause but, rather, upon Maryland Rule 5–616(a)(4),[8] it did squarely address the confrontation issue in *Martinez,* and, interestingly enough, in so doing,

---

**8.** Maryland Rule 5–616(a)(4) provides that "[t]he credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at ... [p]roving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely[.]"

relied primarily upon its decision in *Calloway*. *See Martinez*, 416 Md. at 429, 431, 7 A.3d 56. Hence, we shall address the two decisions together.

In *Calloway*, a "Nicholas Watson," who was Leon Calloway's cellmate at a correctional facility, called the prosecutor's office and volunteered to testify against Calloway at Calloway's upcoming trial for first-degree child abuse and related offenses. *Calloway*, 414 Md. at 619, 621, 996 A.2d 869. According to Watson, Calloway had made inculpatory statements while they were incarcerated together. Thereafter, but prior to Calloway's trial, Watson was released from jail; charges pending against him were nolle prossed; and, although Watson, who was on probation for an unrelated charge, had an altercation, while incarcerated, with another inmate and was charged with second-degree assault, he was not charged with violating his probation. *Id.* at 619, 630, 637, 996 A.2d 869.

At Calloway's trial, the State filed a motion in limine, requesting that the defense be precluded "from cross-examining Watson about whether he had volunteered to testify for the State in the hope that he would receive some benefit in the cases that were pending against him when he contacted the prosecutor's office." *Id.* at 619, 996 A.2d 869. After hearing testimony from Watson that his "only motive" in contacting the State's Attorney "was from the heart" and not because he expected to receive a benefit in exchange for his testimony, the trial court granted the State's motion. *Id.* at 631, 996 A.2d 869.

Watson thereafter "testified at length" about his jailhouse conversations with Calloway, asserting that Calloway had informed him that he had abused his son, Gavin, because he believed that his wife was unfaithful and that Gavin "was not his." *Id.* at 620, 996 A.2d 869. Although, during closing argument, the prosecutor assured the jury that "Nicholas Watson was genuine, heartfelt, full of emotion [and] wanted to say what [Calloway] said to make sure that Gavin's voice was heard," *id.* at 639, 996 A.2d 869, Calloway was not permitted

to counter that assurance with "circumstantial evidence" of Watson's "self interest that was based upon what actually occurred before he was called to testify." *Id.* at 637, 996 A.2d 869. At the conclusion of the trial, Calloway was convicted of second-degree assault but, as the jury was unable to reach a verdict on the other charges, a mistrial was declared as to those counts. *Id.* at 621, 996 A.2d 869.

Reversing the assault conviction, the Court of Appeals held that the issues of whether Watson placed the telephone call to the prosecutor's office "in the hope of being released from detention," and whether he was testifying at trial "in the hope of avoiding a violation of probation charge," should have been resolved by the jury rather than by the trial court. *Id.* at 637, 996 A.2d 869. Citing *Leeks v. State*, 110 Md.App. 543, 557–58, 678 A.2d 80 (1996), where this Court held that, in a criminal jury trial, "questions permitted by Rule 5–616(a)(4) should be prohibited only if (1) there is no factual foundation for such an inquiry in the presence of the jury, or (2) the probative value of such an inquiry is substantially outweighed by the danger of undue prejudice or confusion," Maryland's highest court found that there was a "solid factual foundation for an inquiry into Watson's self interest" and that the circumstantial evidence of Watson's self interest "was not outweighed—*substantially* or otherwise—by the danger of confusion and/or *unfair* prejudice to the State." *Id.* at 639, 678 A.2d 80 (emphasis in original).

In *Martinez v. State*, Eduardo Martinez was accused of stabbing two men with a screwdriver multiple times, resulting in the death of one of them, Carlos Humberto Castro–Ventura. *Martinez*, 416 Md. at 421, 7 A.3d 56. The individual who survived that attack, Santos Lorenzo Mejicanos, was interviewed by police while recuperating at a hospital. Mejicanos identified Martinez as the man who stabbed him and further indicated that he had been attacked by a second assailant, whom police were able to identify as a "Roberto Nicholas." *Id.* After obtaining a warrant to search Nicholas's dwelling, police recovered, from that location, two screwdrivers believed to have been the murder weapons. *Id.*

At the ensuing trial of Martinez, Nicholas, "a self-described MS–13 member," and Mejicanos, who denied membership in that gang, were "the State's key witnesses." *Id.* at 421, 422 & n. 1, 7 A.3d 56. Nicholas testified that he, Martinez, and others, were out at night drinking beer in a park, when they encountered a rival group that included Mejicanos as well as Castro–Ventura and that, during the melee that followed that encounter, Martinez stabbed both Mejicanos and Castro–Ventura with a screwdriver. *Id.* at 422, 7 A.3d 56.

Although Mejicanos failed to appear, initially, for Martinez's trial, he was arrested the next day, pursuant to a writ of body attachment, and produced by police to testify on the second day of trial. Just before Mejicanos took the stand, defense counsel requested the permission of the court to ask Mejicanos about his unrelated charges of felony theft, unauthorized use of a vehicle, and possession of drug paraphernalia, charges which had been nolle prossed by the State six days before Mejicanos testified at a pre-trial motions hearing in the Martinez case. *Id.* at 422–23, 7 A.3d 56. The trial court denied that request, relying upon Maryland Rule 5–403, which permits a trial court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Martinez*, 416 Md. at 425, 7 A.3d 56.

During direct examination, Mejicanos corroborated Nicholas's testimony and further identified Martinez as his assailant. Later, during a bench conference, defense counsel observed that the State had not brought out that Mejicanos was then incarcerated and asked the court's permission to raise that issue during cross-examination, citing Maryland Rule 5–616(a)(4), which permits cross-examination of a witness through "questions that are directed at [p]roving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely." *Martinez*, 416 Md. at 426, 7 A.3d 56. The trial court denied that request, and Martinez was ultimately convicted of involuntary man-

slaughter, first-degree assault of Castro–Ventura, and attempted second-degree murder and first-degree assault of Mejicanos. *Id.* at 427, 7 A.3d 56.

The Court of Appeals reversed. After observing that its decision in *Calloway* "inform[ed] the resolution of" the case before it, *id.* at 429, 7 A.3d 56, the Court noted that the State's nolle prossing of charges against Mejicanos, just six days before he testified at the motions hearing in Martinez's case, and its incarceration of him pending his testimony were evidence of "bias, motivated by self-interest." *Id.* at 431, 7 A.3d 56. As Mejicanos may have believed that he would receive a benefit from the State in exchange for his testimony, there was a "solid factual foundation" for the defense's inquiry into Mejicanos's motive for testifying, an inquiry which "was not outweighed at all, much less substantially so, by the danger of confusion to the jury or unfair prejudice to the State." *Id.* The Court concluded that Martinez's right of confrontation had been violated, reversed his convictions, and granted him a new trial. *Id.* at 432, 7 A.3d 56.

For the very same reasons, it was error for the court below to prohibit appellant from cross-examining Ms. Luna because of a purported lack of "factual basis" for doing so, particularly, as she had testified, at appellant's first trial, that she was both illegally in the United States and aware of the potential deportation consequences if she were convicted of possessing the stolen handgun at issue. Moreover, as in *Calloway* and *Martinez*, evidence that Ms. Luna had a motive to testify falsely "was not outweighed at all, much less substantially so, by the danger of confusion to the jury or unfair prejudice to the State." *Martinez*, 416 Md. at 431, 7 A.3d 56.

Nor was the purported conflict between appellant's confrontation right and Ms. Luna's Fifth Amendment privilege a sufficient basis for the trial court's ruling. As appellant points out, merely asking Ms. Luna questions is not a violation of her Fifth Amendment privilege, whereas compelling her to answer them is. Moreover, *Gray v. State*, 368 Md. 529, 796 A.2d 697 (2002), which is cited by both sides, while not *requiring* a trial

court to permit a defendant to call a witness before a jury, with the expectation that the witness will invoke the Fifth Amendment privilege against self-incrimination, *id.* at 558–59, 796 A.2d 697, does not forbid a trial court from doing so. In any event, in *Gray*, it was the defendant who sought to call the witness, and, as a consequence, that case did not implicate the Confrontation Clause as the matter before us does, where it was the State which called the witness in question and the defense whose cross-examination of that witness was restricted by the court.

We conclude that the trial court erred in prohibiting appellant from pursuing a legitimate line of inquiry during Ms. Luna's cross-examination, directed towards showing that she had a motive to testify falsely. Moreover, as in *Martinez*, 416 Md. at 432 n. 9, 7 A.3d 56, the State does not argue that the error was harmless, and hence, we "need not, and will not, undertake a review of the record to decide that issue." [9]

 To provide further guidance in the event that appellant is re-tried upon remand, we make the following observations: Ms. Luna, by testifying at appellant's first trial, did not waive her Fifth Amendment right to be free from compelled self-incrimination at any subsequent trial or proceeding. *See Dickson v. State*, 188 Md.App. 489, 511, 982 A.2d 850 (2009) (observing that the "law is well established that a person's waiver of his or her Fifth Amendment privilege in one trial or proceeding does not preclude him or her from asserting the claim of privilege as to the same subject matter in a subsequent trial or proceeding"). Thus, if she is called as a witness in a re-trial of this case, she may invoke her Fifth Amendment right if she is questioned as to her immigration status or her

---

9. The closest the State comes to raising harmless error is at page 15 of its brief, where, quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), it contends that appellant has failed to meet his burden to show that a reasonable jury " 'might have received a significantly different impression' " of Ms. Luna's credibility if he had been permitted to inquire as to her immigration status and that, consequently, "there is no Sixth Amendment violation." But for reasons we have explained, there was a Sixth Amendment violation.

awareness that she may be eligible for deportation if convicted of possession of a stolen handgun.

Furthermore, *Gray* sheds light on two important questions that arise in light of our holding: First, what is the permissible scope of cross-examination as to Ms. Luna's immigration status and eligibility for deportation? And, second, what is the permissible scope of counsel's comment regarding her (expected) invocation of the Fifth Amendment? Although we of course decline to consider an issue not before us, we do note the concurring opinion of Judge Wilner, joined by Judges Raker and Harrell of the Court of Appeals:

> The defendant's proper goal may be achievable by the propounding of just a few basic questions to the witness. The court, in my view, is not required to allow a wholesale fishing expedition by defense counsel that, in effect, puts the witness on trial through unanswerable accusations.

*Gray,* 368 Md. at 582, 796 A.2d 697 (Wilner, J., concurring). For guidance as to the second question, we turn to Judge Raker's concurring opinion in the same case, an opinion in which she was joined by Judges Wilner and Harrell:

> If the court permits a witness to invoke the Fifth Amendment before the jury, either party should be entitled to a jury instruction indicating that the invocation of the privilege against self-incrimination is not, in and of itself, evidence that the witness is guilty of a crime. Of course, counsel should be permitted to argue any appropriate inferences raised by the evidence at the trial.

*Id.* at 581, 796 A.2d 697 (Raker, J., concurring).

Finally, we note that Ms. Luna's testimony, at appellant's first trial, may be admissible as evidence, under Maryland Rule 5–804(b)(1), if she were to invoke her Fifth Amendment right at a subsequent re-trial of appellant, as her invocation of the Fifth Amendment would render her "unavailable," under Rule 5–804(a)(1), and if the State, at the first trial on this matter, clearly "had an opportunity and similar motive to develop" her testimony "by direct, cross, or redirect examination," *Id.* § (b)(1).

### III.

Appellant contends that the trial court erred in overruling his objection to the State's proposed "anti-CSI" jury instruction, which the court subsequently gave to the jury. The State counters that appellant failed to preserve this issue for our review because his objection below was based on grounds different from those he now articulates on appeal.

We begin by observing that the State's non-preservation argument is unpersuasive. During a discussion between court and counsel regarding jury instructions, defense counsel stated:

And we also object to a couple of the State's, the last one, the special instruction at the end. It might be it reads like a closing argument and is cumulative to some of the other arguments, some of the other instructions.

When the court responded by referring to a different instruction, defense counsel focused the court's attention on the "anti-CSI" instruction, which led to the following colloquy:

[DEFENSE COUNSEL]: And then I think, so then our objection is to the last instruction proposed by the State and then the State is—

THE COURT: The last instruction?

[DEFENSE COUNSEL]: Proposed by the State.

THE COURT: Which is the evidence instruction?

[DEFENSE COUNSEL]: Yes.

THE COURT: Why do you object to that?

[DEFENSE COUNSEL]: I just find it cumulative to all the other instructions and frankly it reads like a closing argument.

I mean, [the prosecutor] can make that argument in her closing. I don't think the jury should be instructed on that. I think it gives it—

Then, relying upon *Evans v. State*, 174 Md.App. 549, 922 A.2d 620, *cert. denied*, 400 Md. 648, 929 A.2d 890 (2007), the trial court denied appellant's objection to the State's proposed instruction:

THE COURT: This argument came up as a result of the State having to respond to arguments that, you know, there are no fingerprints; there's no DNA; there's no forensic evidence, and so forth. And that's how this instruction was born.

[DEFENSE COUNSEL]: I understand. But the State also gets to open and close so they can respond to that argument for both, or frankly even opening. They know it's coming.

THE COURT: All right. Well, we can have the instruction and they can respond to that argument in closing.

[DEFENSE COUNSEL]: Just please note my objection.

The court later gave the following instruction to the jury:

During this trial, you've heard testimony of witnesses and may hear argument of counsel that the State did not utilize a specific investigative technique or scientific test. You may consider these facts in deciding whether the State has met its burden of proof.

You should consider all of the evidence, or lack of evidence, in deciding whether the defendant is guilty or not guilty.

However, I instruct you that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case.

Your responsibility as jurors is to determine whether the State has proven, beyond a reasonable doubt, the defendant's guilt beyond a reasonable doubt.

It is undisputed that this instruction was virtually identical to that which was given in Atkins v. State, 421 Md. 434, 441–42, 26 A.3d 979 (2011), and Stabb v. State, 423 Md. 454, 460–62, 31 A.3d 922 (2011). In both cases, the Court of Appeals held that the trial court had abused its discretion in giving this instruction. Moreover, in objecting to that instruction, appellant's counsel asserted that the instruction was "cumulative," that "it read[ ] like a closing argument," and that the prosecutor "[could] make that argument in her closing."

■ Although it is true that appellant, in his brief, presents a more elaborate argument, suggesting that the instruction also relieved the State of its burden to prove his guilt beyond a reasonable doubt, invaded the province of the jury, and amounted to non-neutral commentary on the evidence, there is sufficient overlap between the arguments raised in his brief and those raised below to satisfy the preservation requirement of Maryland Rule 4–325(e), which requires that a party wishing to assign as error the giving of a jury instruction must "distinctly" state "the matter to which the party objects and the grounds of the objection." Specifically, appellant's contentions below that the "anti-CSI" instruction "read[ ] like a closing argument" and that the prosecutor "[could] make that argument in her closing" are sufficiently similar to his assertion, before this Court, that the instruction constituted non-neutral commentary on the evidence and, thus, invaded the province of the jury to deem this argument preserved for appellate review.

■ Unswayed by the State's non-preservation argument, we turn now to the substance of appellant's contention, the merits of which the State has, essentially, conceded, that is, that the trial court committed reversible error in giving the "anti-CSI" jury instruction.[10] Although *Atkins* and *Stabb* did not promulgate a per se rule requiring reversal when a trial court has given an "anti-CSI" jury instruction, *see, e.g., Atkins*, 421 Md. at 454, 26 A.3d 979; *Stabb*, 423 Md. at 462–63, 31 A.3d 922, the Court of Appeals advised in *Stabb:*

---

10. The State has not expressly conceded the point, but it only addresses, in its brief, whether we should review the jury instruction issue for plain error (except for a single assertion, in a footnote, that, if we were to find that this claim was preserved, "any error in transmitting the 'no duty' instruction in this case was harmless"). Thus, the absence of argument that this issue was *not* error under *Atkins v. State,* 421 Md. 434, 26 A.3d 979 (2011), and *Stabb v. State,* 423 Md. 454, 31 A.3d 922 (2011), leads us to conclude that the State has waived any such argument. Md. Rule 8–504; *Abbott v. State,* 190 Md.App. 595, 632 n. 14, 989 A.2d 795 (2010) (observing that "if a point germane to the appeal is not adequately raised in a party's brief, the court may, and ordinarily should, decline to address it").

[T]he use of "anti-CSI effect" jury instructions (especially when given preemptively before closing arguments or otherwise improper defense questioning or commentary during trial regarding the absence of scientific evidence as part of the State's case) is fraught with the potential for reversible error. To the extent that such an instruction is requested, its use ought to be confined to situations where it responds to correction of a pre-existing overreaching by the defense, i.e., a curative instruction.

*Id.* at 472–73, 31 A.3d 922.

It is telling that the State does not suggest that a curative instruction was all that was required here. Instead, it attempts to persuade us that appellant's counsel failed to make a sufficiently particularized objection, as required under Maryland Rule 4–325(e), to preserve this issue; that therefore, a plain error standard of review should apply; and that, as the only Maryland authority at the time of trial was this Court's decision in *Evans v. State, supra,* 174 Md.App. 549, 922 A.2d 620, where we upheld a virtually identical instruction, the error appellant complains of cannot be "plain." But, as previously noted, the first link in this chain of reasoning—the failure to preserve the issue—is broken.

In any event, it was the State, not appellant, who first raised the issue below, when the prosecutor questioned Officer Power about the decision of the police not to fingerprint the handgun, eliciting from him several reasons underlying that decision; namely: that the Forensic Services Unit was not called to the scene because it only responds to more serious, violent, crimes; that he had been previously able to successfully lift fingerprints from a crime scene "maybe a handful of times" out of "maybe 40" attempts; and that the handgun was found in close proximity to appellant, obviating the need for fingerprints.

Moreover, appellant's counsel, during closing argument (after the anti-CSI instruction had already been given), did not "overreach" but merely pointed out that the lack of fingerprint evidence weighed in favor of his client:

Would it have helped if the officer had taken fingerprints off the gun? Sure. Does it mean that the officers didn't do their job? Not really. Could the officers have handled the gun in such a way to try to look for prints? Sure.

All this means is simply that there's no evidence connecting that gun to [appellant]. And that weighs in favor of his innocence.

And later:

Lyndon Watkins the firearms examiner, what did he say? Not much. You can get fingerprints off a firearm, so what? They didn't do it in this case. Could they have? Sure. Is it a hassle? Sure. But again, no fingerprints, no connection to [appellant].

\* \* \*

I think what you probably have realized over two days is that had there been better evidence, [the prosecutor] would have presented it. Very tenacious. One of the State's best prosecutors. Had there been better evidence, she would have brought it before you. No. It doesn't exist.

The police did their job in this case. They pulled over somebody driving erratically.

When you find someone not guilty, it just means that the State hasn't met its very, very high burden. It doesn't anybody [sic], that the State did anything wrong. They have a high burden. When you want to convict someone, you need to prove it. And you need to provide evidence.

This line of commentary is nothing more than legitimate advocacy and certainly is not impermissible "harp[ing]" on "the lack of physical evidence." *Stabb*, 423 Md. at 471, 31 A.3d 922. *See Atkins*, 421 Md. at 453, 26 A.3d 979 (observing that, "when 'the State has failed to utilize a well-known, readily available, and superior method of proof to link the defendant with the criminal activity, the defendant ought to be able to comment on the absence of such evidence'") (quoting *Sample v. State*, 314 Md. 202, 207, 550 A.2d 661 (1988)). Rather, as in *Atkins*, 421 Md. at 453–54, 26 A.3d 979, and *Stabb*, 423 Md. at 471, 31 A.3d 922, defense counsel's com-

ments were "legitimate, brief, and reasonable," and there was no need to give a curative instruction. Thus, as in *Atkins* and *Stabb*, the circuit court abused its discretion in giving the "anti-CSI" jury instruction, and, on this basis alone, reversal is required.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MONTGOMERY COUNTY.**