ACCEPTED
06-14-00115-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
4/21/2015 4:41:51 PM
DEBBIE AUTREY
CLERK

## NO. 06 – 14 – 00115 – CR

IN THE SIXTH DISTRICT COURT OF APPEALS
TEXARKANA, TEXAS

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
4/21/2015 4:41:51 PM
DEBBIE AUTREY
Clerk

**CORDERO BROWN,**

**Appellant,**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

On appeal from the 124 District Court, Gregg County, Texas
Trial Court Case No. 42,258-B

## AMENDED BRIEF OF THE STATE OF TEXAS

**ORAL ARGUMENT REQUESTED IF GRANTED TO APPELLANT**

CARL DORROUGH
GREGG COUNTY DISTRICT ATTORNEY

Zan Colson Brown
Texas Bar No. 03205900
Assistant District Attorney
Gregg County, Texas
101 East Methvin St., Suite 333
Longview, Texas  75601
Telephone: (903) 236–8440
Facsimile:  (903) 236–3701

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...........................................................................1

INDEX OF AUTHORITIES ...................................................................3

STATEMENT OF FACTS ......................................................................5

SUMMARY OF THE ARGUMENTS...................................................10

ARGUMENT AND AUTHORITIES ...................................................12

1) Issue 1: The Appellant has not proved a *Batson*
   violation. ........................................................................................12

2) Issue 2: The evidence is sufficient to prove appellant
   participated in the aggravated robbery of Jera Lynn
   Johnson...........................................................................................20

   a.    *The standard of review is whether a rational*
         *factfinder, viewing the evidence in the light most*
         *favorable to the judgment, could find the defendant*
         *guilty beyond a reasonable doubt.* ...........................................21

   b.    *Statutes define aggravated robbery and unlawful*
         *appropriation.* .........................................................................22

   c.    *Brown challenges the proof that he was present at the*
         *Johnson home.*..........................................................................23

   d.    *Ample evidence proves Brown was with the Chester*
         *brothers at the Johnson home.*..................................................23

3) Issue 3: The theory of alibi merely negates one
   element of the State's burden of proof; it's not a
   statutory defense that requires an instruction. ............................30

4) Issue 4: No abuse of discretion is proved by a trial
   court's admitting a photo of Brown with a gun. ...........................34

**5) Issue 5: No abuse of discretion is proved by the admission of a 911 audio tape that was not disclosed before trial.**......................................................................**36**

**CONCLUSION AND PRAYER**...............................................................**45**

**CERTIFICATE OF SERVICE**...............................................................**46**

# INDEX OF AUTHORITIES

## Federal Cases

*Bryan v. United States*, 373 F.2d 403 (5th Cir. 1967)..............................................32

*Bursten v. United States*, 395 F.2d 976 (5th Cir. 1968)..........................................32

*Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974).............31

*Delaware v. Van Arsdall*, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) ...................................................................................................................31

*Griffith v. Kentucky*, 479 U.S. 314, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987) ......13

*Hernandez v. New York,* 500 U.S. 352, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) ............................................................................................................... 15, 18

*Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) .......21

*Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991) ..........13

*Purkett v. Elem*, 514 U.S. 765, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) .........14

*Strauss v. United States*, 376 F.2d 416 (5th Cir. 1967)..........................................32

## State Cases

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) ........................................................21

*Cantu v. State*, 842 S.W.2d 667 (Tex. Crim. App. 1992) ......................................13

*Carrero-Vasquez v. State*, 210 Md. App. 504, 63 A.3d 647 (Md. Ct. Spec. App. 2013) .................................................................................................................31

*Castillo v. State*, 739 S.W.2d 280 (Tex. Crim. App. 1987).....................................22

*Coleman v. State*, 804 S.W.2d 563 (Tex. App.—Houston [14th Dist.] 1991, no pet.).....................................................................................................................22

*Giesberg v. State*, 984 S.W.2d 245 (Tex. Crim. App. 1998)............................ 31-33

*Hardin v. State*, 20 S.W.3d 84 (Tex. App.—Texarkana 2000, pet. ref'd)..........37

*Leadon v. State*, 332 S.W.3d 600 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ................................................................................................................ 13, 17, 19

*Lockett v. State*, 2006 Tex. App. LEXIS 2930 (Tex. App. Texarkana Apr. 13, 2006)……………………………………………………………………………..14

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990), ................... 35, 37

*Moore v. State,* 265 S.W.3d 73 (Tex. App.--Houston [1st Dist.] 2008) ...............13

*Oprean v. State*, 201 S.W.3d 724 (Tex. Crim. App. 2006) ............................. 37, 38

*Prosper v. State,* 788 S.W.2d 625 n.2 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd) ................................................................................................16

*Rachal v. State*, 917 S.W.2d 799 (Tex. Crim. App. 1996) ...................................35

*Roberts v. State*, 29 S.W.3d 596 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) ................................................................................................................35

*Tompkins v. State*, 774 S.W.2d 195(Tex. Crim. App. 1987),........................ 17, 18

*Whitsey v. State*, 796 S.W.2d 707(Tex. Crim. App. 1989), ..................................13

## State Statutes

Tex. Crim. Proc. Code Ann. art. 35.261 (Vernon 2014) ....................................12

Tex. Crim. Proc. Code Ann. art. 37.07 (Vernon 2014) ......................................34

Tex. Pen. Code Ann. § 22.02  (Vernon 2014) .................................................... 23

Tex. Pen. Code Ann. § 29.02 (Vernon 2014) ......................................................22

Tex. Pen. Code Ann. § 31.03 (Vernon 2014) ......................................................22

## STATEMENT OF FACTS

Jera Lynn Johnson, age 77, was reading when her home was forcibly entered on January 14, 2012, by three individuals, two of whom were tall and one of whom was short. 3 RR 50, 72, 84. All wore hoodies. 3 RR 80. One of the taller ones, who wore a dark hoody, but whose face was uncovered, held a gun to Ms. Johnson's head, demanding to know where her jewelry was. He repeatedly threatened to kill her. 3 RR 48, 49. The shorter one and the other tall one were wearing masks and possibly gloves 3 RR 50, 97, 105. The one with the gun was giving orders to the others. 3 RR 51. After loading Johnson's property into their van, they taped Johnson's mouth, hands and feet and put her in the trunk of her car, telling her she would suffocate in there. 3 RR 73.

The Adkins, neighbors across the street, noticed the van parked at Ms. Johnson's home, saw two individuals carry property to the van from Ms. Johnson's house, called her but got no answer, saw three individuals exit her house and leave in the van, knocked on her door, got no answer, and called police, describing the van and the actors. The 911 call was made at 10:36 a.m. 3 RR 33, 103-106.

Police were dispatched at 10:40, and responded, arriving in about five minutes, found the door unlocked, the house ransacked, checked the garage, heard Ms. Johnson's cries from the trunk, and freed her. 3 RR 33, 34, 35. She was terrified. 3 RR 36. EMS was called to evaluate her. 3 RR 35, 36.

Ms. Johnson said the man with the gun repeatedly said he would kill her and kept the gun pointed at her right temple. 3 RR 49-50, 65. She believed he was going to shoot her. 3 RR 72. He was giving orders to the others. 3 RR 51. In addition to gold jewelry, they took a necklace made of a silver dollar inside a "rope" bezel, three televisions and one shotgun, a billfold with cash, a cell phone and a camera. 3 RR 55, 93,94. Police made a video of the scene. SX1; 3 RR 37. Jera Johnson estimated the intruders were at her house for 30-35 minutes. 3 RR 51, 75.

Minutes later, between 10:45 and 11:00 a.m. Appellant (5'4") and his two brothers-in-law, Reco Chester (5'11") and Lorenzo Chester (6'1"), arrived at the Gold Rush Mercantile and Trading Company. 3 RR 113, 115 158; 4 RR 78 SX 55, 100, SX 101. There, they produced identification, which was copied as they sold the gold items for money. The owner of the Gold Rush, Claire Alford, recognized Cordero Brown as a previous customer. 3 RR 141. The brothers were paid in cash. 3 RR 121-130; SX 45-49 The Appellant was paid by check for $1250, which he promptly cashed at the Citizens Bank down the street, where his image was captured by a security camera. 3 RR 121-1125; SX 45-47.

The 911 call from Ms. Adkins was recorded at 10:36 a.m. 3 RR 33. The neighbor testified she made the call "almost immediately," certainly in fewer than five minutes after the van left Johnson's house. 3 RR 106-107. Appellant cashed

6

the Gold Rush check at 11:58 a.m. 3 RR 126, 127, 156 188, 190, 192; SX 46, 47. Evidence of the times of 911 call (10:36 a.m.) and the check cashing (11:58 a.m.) was uncontested.

The time of the first knock on Johnson's door was contested. The State put on Ms. Johnson who said it was 10:00, and on cross-examination, she recalled looking at the clock when she heard the knock. 3 RR 46, 75, 82, 83, 85. The Defense showed her reports by Detectives Easterling and Mitchell, who both had reported that she told them the knocks came at 9:30, but she did not recall telling them that, and insisted, at trial, that the time was 10:00. 3 RR 83-85.

The defense also challenged Claire Alford's and Jeremy Simpson's time estimates of the time the three men arrived at Gold Rush. 3 RR 136-137, 158. However, in their video statements on January 17th and at trial, both Alford and Simpson testified that the men arrived at approximately 10:45-11:00 a.m. After speaking with Alford and Simpson on the 15th, Mitchell had reported that Alford had estimated they arrived at 11:30 a.m., and Simpson estimated between 11:15 and 11:30. 3 RR 158, 166. Alford testified she did not recall telling Mitchell they came in at 11:30; in fact, she said she did not tell him that. 3 RR 136-137. Simpson recalled telling Mitchell 11:15-11:30 on the 15th, but after talking with Alford and others at Gold Rush, he revised his estimate to between 10:45 and 11:00 when he gave his official statement to Mitchell on the 17th. 3 RR 157-58. No investigator

7

coached him on time estimates. 3 RR 159. Both Alford and Simpson estimated that the men stayed in Gold Rush for about an hour. 3 RR 117,127, 133, 159; 4 RR 12.

When they left Gold Rush, the two Chester brothers had cash, but Brown had a check for $1250. He went directly to the Citizen's Bank, where the check was drawn, and cashed it. The bank is located about a mile and a half from Gold Rush on Gilmer Road. Surveillance video shows that he arrived at 11:54:09 and exited at 11:59:44. SX 54; 3 RR 191. A time-stamped copy of the check with Brown's endorsement shows that he cashed it at 11:58. SX 46 and 47; 3 RR 189.

The owner of Gold Rush, Claire Alford, heard about the home invasion and robbery on the radio at 5:00 p.m. on January 14, 2012, recognized a possible connection, and called Gregg County Sheriff's Office to inform them of her purchase of the gold. 3 RR 146-147; 4 RR 12-14: SX 102.

Detective Mitchell appeared at Gold Rush early on January 15, where he picked up the jewelry sold by the three men, and took it (with permission from Spencer Alford) to show it to Ms. Johnson. 5 RR 41-43; 3 RR 157-158. She identified some of the pieces as hers. 3 RR 93. At trial, she was able to identify the jewelry pieces and where she got them. 3 RR 77-80.

The brothers were arrested in the van the afternoon of the 15th, and the Appellant that evening. The van contained hoodies, masks, gloves, and a gold earring. SX 65-83; 4 RR 43-51. When interviewed by District Attorney

8

Investigator Chris Miller, Appellant admitted selling the jewelry, but denied being a part of the home invasion/aggravated robbery. SX 88. He claimed to have been at home between 9:30 and 10:30, baby-sitting his children because his wife was at work. SX 88 at 6:50-7:11. He later changed his story saying wife was at home with them. SX 88; 5 RR 27.

When Miller asked why somebody would bring him jewelry to cash in, Miller testified Brown responded with "Because they robbed somebody." 5 RR 12; SX at 20:58. At trial, he denied saying this, claiming instead that he said "They just brought it to me" or "Because it was brought to me." 5 RR 140.

Brown was subsequently indicted, tried, and convicted. A motion for new trial was denied, and this appeal ensued.

## SUMMARY OF THE ARGUMENTS

Issue One: The State used peremptory strikes against three of the six available black members of the jury panel; one of the seven original black members, Mitchell, was excused by agreement; one, a probation officer, was struck by the defense; three were struck by the State, and two, Smith and Bell, were not struck, but were not reached. When the defense raised the *Batson* issue, the State met its burden of production with non-racial reasons for striking venire members Rogers, Bee and Hawkins. (Rogers was 21, had piercings and tattoos; Bee and Hawkins were working or had worked as postal workers, and Hawkins felt his brother had been wrongly accused 25 years ago). The Defense then said nothing more to meet its burden of persuasion that the State's reasons were pretextual for decisions that were actually based on race.

Issue Two: Brown challenges the sufficiency of evidence only on the element of his being a part of the aggravated robbery. He admitted only cashing in the stolen jewelry. Viewing the totality of the evidence in a light favorable to the verdict, any reasonable juror could have found, beyond a reasonable doubt, that Cordero Brown was the short member of the trio who committed aggravated robbery against Jera Lynn Johnson on January 14, 2013. He had to have participated in the robbery, and was not, therefore, at home with his children, when

the trio left Johnson's house just before 10:36, went to Gold Rush, sold the jewelry, and then left and arrived at Citizen's bank by 11:54.

Issue Three: The theory of alibi merely negates one element of the State's proof. Alibi not a statutory defense that requires an instruction. Thus, it was not error for the judge to decline to give a requested instruction on alibi.

Issue Four: No abuse of discretion is proved by a trial court's admitting a photo of Brown with a gun. The record does not show that the picture was more prejudicial than probative.

Issue Five: No abuse of discretion is proved by the admission of a 911 audio tape that was not disclosed before trial. The record does not demonstrate that the State intended to violate the discovery order or to harm the defendant by failing to disclose the contents of a 911 call from a witness to report her purchase of gold.

# ARGUMENT AND AUTHORITIES

## 1) Issue 1: The Appellant has not proved a *Batson* violation.

Article 35.261 of the Texas Code of Criminal Procedure provides for race-neutral reasons for peremptory challenges:

(a) After the parties have delivered their lists to the clerk under Article 35.26 of this code and before the court has impanelled the jury, the defendant may request the court to dismiss the array and call a new array in the case. The court shall grant the motion of a defendant for dismissal of the array if the court determines that the defendant is a member of an identifiable racial group, that the attorney representing the state exercised peremptory challenges for the purpose of excluding persons from the jury on the basis of their race, and that the defendant has offered evidence of relevant facts that tend to show that challenges made by the attorney representing the state were made for reasons based on race. If the defendant establishes a prima facie case, the burden then shifts to the attorney representing the state to give a racially neutral explanation for the challenges. The burden of persuasion remains with the defendant to establish purposeful discrimination.

(b) If the court determines that the attorney representing the state challenged prospective jurors on the basis of race, the court shall call a new array in the case.

Tex. Crim. Proc. Code Ann. art. 35.261 (Vernon 2014).

The equal protection clause of the United States' Constitution prohibits a prosecutor from using peremptory challenges on potential jurors solely on account of their race or on the premise that jurors of the same race as the defendant will not be able to consider the state's case impartially. *Batson v. Kentucky*, 476 U.S. 79,

85-86, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), *holding modified by Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991); see *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987).

The evidence from a *Batson* hearing is reviewed in the light most favorable to the trial court's ruling. *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992). A trial judge's finding that the State exercised its strikes in a race neutral manner is not subject to being overturned unless such ruling is clearly erroneous. *Cantu*, 842 S.W.2d at 689, citing *Whitsey v. State*, 796 S.W.2d 707, 720-23 (Tex. Crim. App. 1989), on reh'g (Sept. 19, 1990)(op. on reh'g). A reviewing court may hold that a decision was "clearly erroneous," only if they are left with a "definite and firm conviction that a mistake has been committed." *Leadon v. State*, 332 S.W.3d 600, 611 (Tex. App. Houston 1st Dist. 2010 no pet.) citing *Moore v. State,* 265 S.W.3d 73, 78 (Tex. App.--Houston [1st Dist.] 2008). Much deference is given to a trial court's perception of the credibility of the prosecutor's reasons because he was there to observe it. *Cantu*, 842 S.W.2d at 689.

The standard procedure for deciding a *Batson* Challenge has three steps:

- First, opponent of a peremptory strike must make a prima facie case of racial discrimination.  This a burden of production.

- Second, the strike's proponent must rebut the allegation by giving race-neutral reasons for strikes. This burden, too, is one of production.

- Third, the opponent must persuade the judge that the real reason was not race-neutral. *Purkett v. Elem*, 514 U.S. 765, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995).

The State, being the proponent of the strikes, has no burden of persuasion. *Puckett,* at 767-768.

When the defense raised a Batson challenge by observing that no African-American jurors were about to be empaneled as a juror or alternate, the State's attorney gave a race-neutral reason for striking three of the six black jurors open to a State strike. 3 RR 128. The prosecutor said that Ms. Rogers (potential juror Number 2) had piercings to her ears, lips and nose and was only 21 years old. 2 RR 128. Ms. Bee (potential juror number 22) and Mr. Hawkins (potential juror number 34) were or had been postal workers; additionally, Mr. Hawkins had a brother whom he believed to have been wrongly accused in Smith County. 2 RR 129. These were not race-based reasons. The State has no obligation to prove its reasons for striking were persuasive, or even plausible. *Puckett,* at 767-768. In an unpublished opinion, this Court relied on a Supreme Court case to hold, "We cannot require the State's explanation to be plausible or persuasive so long as it is racially neutral," and "Unless a discriminatory intent is inherent in the State's explanation, the reason offered will be deemed racially neutral." *Lockett v. State*, 2006 Tex. App. LEXIS 2930 (Tex. App. Texarkana Apr. 13, 2006) (citing

14

*Hernandez v. New York,* 500 U.S. 352, 360, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991).

Additionally, there were four black potential jurors that the State did not unilaterally strike: Smith and Bell (potential jurors number 35 and 36) were not struck; Ms. Mitchell (number 12) was an agreed strike after disqualifying herself because she felt she might be swayed by the media attention to the case; and potential juror number 38 Aquila Miller, was a probation officer struck by the defendant. 2 RR 112, 126; Jury List CR 62-63.

The judge agreed with the prosecutor that the Defense had not established a prima facie case for discrimination. Even if they had, they certainly did not meet the burden of persuading the judge that the State's claimed race-neutral reasons for striking three black jurors were pretextual. 2 RR 129-130. The appellant's brief contained arguments for pretext, but those arguments were not made at trial, nor presented to the trial court at the hearing on the motion for new trial. 9 RR 6, 11. At trial, after the prosecutor gave his race-neutral reasons for striking Rogers, Bee and Hawkins, the defense counsel had no further arguments to persuade the judge that the State's reasons for striking those three jurors were pretexts for racial discrimination. 2 RR 129. At the hearing on motion for new trial, appellate counsel had only this to say about the *Batson* issue: "Third, that there was reversible error in rulings on the defendant's Batson challenges to strikes made by the State during

15

voir dire." 9 RR 6. The defendant may not even use a hearing on a motion for new trial to develop a record for a Batson claim, because a *Batson* challenge must be made before the jury is sworn and before the venire panel is discharged. *Prosper v. State,* 788 S.W.2d 625, 627 n.2 (Tex. App., Houston [14th Dist.] 1990, pet. ref'd*Prosper v. State*, 788 S.W.2d 625, 627 n.2 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd)) (quoting *Henry v. State,* 729 S.W.2d 732,737 (Tex. Crim. App. 1987). If it's too late at a motion for new trial, surely it's too late on appeal.

Appellant argues in his brief that the number of strikes against black venire members was disproportionately large. No such argument was made at trial or in the motion for new trial. Appellant argues that the State's striking three black venirepersons of his eleven strikes (27%) was disproportionate to the 17% black jurors in the strike zone. See appellant's brief at 39. The State's explanation of disproportionality was based on three State strikes out of six black jurors in strike zone or 50%--not disproportionately large. Even if this argument were to show disproportionality, it only gets the appellant to a prima facie case. The Court of Criminal Appeals has held that although the disproportionate use of strikes would establish a prima facie case, once the prosecutor provided a race-neutral explanation, the issue of a prima facie case is moot. *Leadon*, 332 S.W.3d, 613.

Beginning on page 40 of his brief, Appellant challenges the race-neutrality of State's strike of Ms. Bee, the retired postal worker, saying she was never asked

16

about her former occupation—but the prosecutor did not say he asked about her former occupation. He said he had "*read* what her profession was," and then he told the judge that she was a retired postal worker. 2 RR 129. The most likely place he read that was on a jury questionnaire. The jury questionnaires are not included in the record because they are shredded after they are used. The clerk recorded that State turned in the two copies they had been issued, and they were presumably shredded. CR 23.

Appellant also complains that there is no scientific data to support the State's bias against USPS workers. No scientific data is necessary. The reason based on employment is not racial. The State can base a peremptory strike on any reason as long as it is not racial.

In 1987, the Court of Criminal Appeals considered a case in which a prosecutor's sole reason for striking a juror the fact that he or she was a postal worker. *Tompkins v. State*, 774 S.W.2d 195, 205 (Tex. Crim. App. 1987), *aff'd,* 490 U.S. 754, 109 S. Ct. 2180, 104 L. Ed. 2d 834 (1989). The Court stated its reasoning:

> We have some difficulty understanding the relevancy of a venireperson's employment as a postman employed by the United States Government as far as his qualifications for jury service. Although the prosecuting attorney indicated that "I have not had very good luck with postal employees", she did not elaborate upon her evident bias against such employees. Perhaps, indeed, federal postal employees share a common view of the criminal justice system antithetical to the interests of law enforcement. But if so, we are not

aware of it, nor has the State undertaken to enlighten us further on the subject.

Notwithstanding what we have stated, we find that the prosecuting attorney's reasons that she gave constitute a racially neutral explanation, and it is not the office of this Court to judge her credibility. Explicit in *Batson*, 476 U.S. 79, is that a prosecuting attorney is free to exercise his peremptory strikes, provided that they are non-race related. "The challenge, after all, is still a peremptory one." See *Belcuore, supra.*

*Tompkins*, 774 S.W.2d at 205(citing *Belcuore,* "Restricting Racially Motivated Peremptory Challenges", 34 Federal Bar News & Journal, January, 1987).

Regarding venire panelist Rogers, the State struck her because of her youth and her piercings, not the color of her skin. 2 RR 128. The Appellant complains that the State never asked her how that would affect her as a juror. The prosecutor did not have to question her about that. The prosecutor's reasons don't have to be persuasive or plausible, as long as they are not racially motivated. *Hernandez*, 500 U.S., 360. Appellant is trying to raise the State's burden of production to a burden of persuasion.

About Mr. Hawkins, venire panelist number 34, the State had two race-neutral reasons: he was a postal worker and he believed Smith County officials had wrongly accused his brother. The defense never showed these reasons to be racially motivated. Appellant argues that he wasn't asked a question about how that experience would affect his impartiality. The State

didn't have the burden to prove that Hawkins would be partial. Again, the Appellant is trying to elevate the State's burden of production to a burden of persuasion. The State did not challenge Hawkins for cause; he merely used a peremptory strike against him.

Finally, Appellant attempts to distinguish *Leadon v. State* from the *Brown* case by pointing out that the prosecutor in *Leadon* had personal experience with postal workers on juries, and the prosecutor in our case did not. See Appellant's brief at 43. The *Leadon* opinion had no such requirement. "When the State indicates that it challenged a prospective juror based on that person's type of employment and that the **State** has had poor success with that type of worker, the reason is a race-neutral explanation. Leadon at 613 (emphasis added.) In the case at hand, the prosecutor said, "The **State** has had a problem with postal workers in the past, and that's very scary to **this prosecutor** working in this particular venue." 2 RR 129.

Appellant further argues that the prosecutor never asked Ms. Rogers or Ms. Bee any questions and those to potential jurors "never responded verbally in the record to any question put by either party's counsel." Appellant's Brief at 43. This is not entirely true. 2 RR 50-51, 72-74. While it is true that the prosecutor never asked them about their employment or their facial piercings or age, he did interact with both of them. Appellant

asks, "So what is the basis, in this record, that justified the strike?" The State gave race-neutral reasons. 2 RR 129. The only time the prosecutor has to provide a reason for a peremptory strike is if defense counsel has established a prima facie case for a racially-motivated peremptory strike. Even then, the State has no burden of persuasion—just an obligation to provide a race-neutral reason, which they did.

No clearly erroneous decision occurred when the trial judge denied the *Batson* challenges. Even if the defense established a prima facie case for a *Batson* challenge, which the State denied (and the judge also disbelieved), the prosecutor put his racially-neutral reasons on the record, and the defense did not rebut them by proving the State's reasons were pretextual. Appellant's first issue should be rejected.

2) **Issue 2: The evidence is sufficient to prove appellant participated in the aggravated robbery of Jera Lynn Johnson.**

Appellant Brown does not contest that he cashed in jewelry that had been owned by Jera Lynn Johnson. He denies that he was present when Johnson's home was invaded and she was assaulted and threatened with death, taped up and locked in the trunk of her car. He claimed instead that he was at home with his wife and children.

### a. The standard of review is whether a rational factfinder, viewing the evidence in the light most favorable to the judgment, could find the defendant guilty beyond a reasonable doubt.

Appellant challenges the sufficiency of the evidence to support the element identifying him as a participant in the aggravated robbery. The standard of review for a challenge to sufficiency of evidence is set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). A reviewing court is required to defer to a fact-finder's credibility and weight determinations. *Brooks v. State,* 323 S.W.3d 893 (Tex. Crim. App. 2010).

On review for sufficiency of evidence, Appellate courts cannot reverse a conviction on sufficiency-of-the-evidence grounds unless no rational factfinder could find the defendant guilty beyond a reasonable doubt. *Jackson*, 443 U.S., 318-19. The evidence is examined in a light most favorable to the verdict. *Id.* This standard is applied to both direct and circumstantial evidence cases. *Butler*, at 239. Evidence is sufficient if the cumulative force of all incriminating circumstances would permit a rational trier of fact to find, beyond a reasonable doubt, that appellant had been with Lorenzo and Rico Chester when they entered Johnson's home, held a gun to her head, threatened to kill her, took her possessions, and left her to suffocate in her trunk. See *Coleman v. State*, 804 S.W.2d 563, 564 (Tex. App.—Houston [14th Dist.] 1991, no pet.) (citing *Castillo v. State*, 739 S.W.2d 280, 288 (Tex. Crim. App. 1987)).

### b. Statutes define aggravated robbery and unlawful appropriation.

The Penal Code provides: "A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." Tex. Pen. Code Ann. § 31.03 (a) (Vernon)"Appropriation of property is unlawful if: (1) it is without the owner's effective consent; (2) the property is stolen and the actor appropriates the property knowing it was stolen by another. . ." Tex. Penal Code § 31.03 (b).

A robbery is defined as follows:

(a) A person commits an offense if, in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property, he:
  (1) intentionally, knowingly, or recklessly causes bodily injury to another; or
  (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.
(b) An offense under this section is a felony of the second degree.

Tex. Pen. Code Ann. § 29.02 (Vernon).

There are multiple ways for a robbery to be "aggravated". A robbery is aggravated if, during the robbery, the person:

- causes bodily injury to another or
- uses or exhibits a deadly weapon or
- causes bodily injury to or threatens or places another person in fear of imminent bodily injury or death, if the other person is:

  - 65 years of age or older; or
  - a disabled person. Tex. Pen. Code Ann. § 22.02 (a) (Vernon).

### c. Brown challenges the proof that he was present at the Johnson home.

The indictment against Brown, tracking the statute, alleged in paragraph A of Count I, that on or about January 14, 2013, in Gregg County, Texas, Cordero Brown, while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally or knowingly did threaten or place Jera Johnson in fear of imminent bodily injury or death, and he then and there used or exhibited a deadly weapon, to wit: a firearm. CR 5. The only element that Brown challenged, at trial or on appeal, was his presence at the robbery, claiming that the Chester brothers came to him with jewelry from an unknown source and he went with them to sell it at the Gold Rush, and then to cash Gold Rush's check at the Citizen's National Bank.

Challenging the State's time line, Brown claimed that he was at home, asleep, when Lorenzo and Reco woke him up and wanted him to go with them to sell the jewelry. He denied being the third person seen at the Johnson home by Johnson and Adkins.

### d. Ample evidence proves Brown was with the Chester brothers at the Johnson home.

The State called Investigator Terry Mitchell to establish that within the parameters of 10:36 to 11:54, the Chester brothers could not have traveled from the Johnson home to Brown's house, awakened him, traveled back to Gold Rush,

spend an hour there, and driven to the bank to arrive there at 11:54. 5 RR 49-54. Through Mitchell, the State introduced State's Exhibits 97, 98, and 99. He testified he ran a computer program to show the distances and estimated driving time from Brown's house to Johnson's house. Then he drove the route three times, at different times of the day, and noted his actual driving time and the actual mileage according to his odometer 5 RR 51-52. The mileage was 12.1 miles and each trip took 18 minutes, driving the speed limit 5 RR 52-53.

Mitchell explained how he produced State's Exhibit 98 with the aid of a computer, and got directions from 6873 Judson, (Johnson's address) to 2909 Gilmer Road, (Gold Rush). Again, he drove the route three times. One trip of 6.8 miles took 20 minutes, and twice the same trip took only 11 minutes. 5 RR 53.

Mitchell also followed the same procedure with State's Exhibit 99, from Brown's house to Gold Rush. He drove that route in 16 minutes on all three tries. 5 RR 54.

When Cordero Brown testified, he described a different route from his house to Gold Rush, and said it would not have taken much longer than the 16 minutes because it didn't have as many lights. 5 RR 120.

Brown disputed the Alford and Simpson testimony that the gold-selling process took an hour: Brown said "not nearly an hour. . . 30 minutes at the most" 5 RR 121.

He claimed he thought he had the authority to sell the gold because Lorenzo had given it to him, and he did not know it came from a robbery. 5 RR 122. Lorenzo gave him and Reco only "$300 apiece" which he and Reco accepted "because it wasn't our jewelry to begin with. . ." 5 RR 123.

When he testified, he claimed that the silver dollar necklace found on his person was a piece of jewelry that Lorenzo let him keep. He admitted lying to Miller about it on the video saying he had been having it for a while. 5 RR 127.

The victim and her neighbor, Ms. Adkins, saw three individuals, two tall and one short, but because of masks, could not definitively say the short one was male or female. The neighbor called police just a few minutes after she saw the van leave Johnson's house. The call was recorded at 10:36 a.m. 3 RR 33. This is uncontested. When DA Investigator Chris Miller showed Brown his identification used at Gold Rush, and a video of him cashing the Gold Rush check made to him and endorsed by him, Brown admitted cashing in the jewelry and cashing the check. SX 88. The uncontested time on the bank's surveillance video shows Brown arriving at the bank at 11:54. SX 54. And the stamp on the check showed he cashed it at 11:58 a.m. June 14. 5 RR 141; SX 46, 47. Claire Alford testified that the three men were in Gold Rush for approximately one hour, plus or minus five minutes. 3 RR 117. Simpson also said they were there about an hour. 3 RR 166. When recalled, Alford went into some detail about why the purchasing process

took such a long time. 4 RR 10-12. Brown challenged this time estimate, saying he believed they were there no more than thirty minutes. 5 RR 121.

The silver dollar necklace described by the victim as hers was found on Brown's person when he was arrested. SX 88; 3 RR 93. When speaking to Investigator Miller and Detective Mitchell, Brown lied about having had it for a while, but at trial, admitted that he had lied and that it had come from Lorenzo. SX 88. 5 RR 127, 146.

Brown claimed not to know what time it was when he was awakened. 5 RR 142. He testified that he got out of bed, put on his pants, brushed his teeth, and left in the van with the Chester brothers and drove to Gold Rush. 5 RR 118. He testified it took no more than two to four minutes at his home. 5 RR 118. His lawyer argued that that could have been done in less than five minutes. 6 RR 29. Brown testified he saw no handgun, shotgun or televisions in the van when he got in. 5 RR 148. He claimed at first not to know where the jewelry came from. He said, simply, that the jewelry was brought to him and he went with the others to cash it in. 5 RR 148. He described the route he drove from his house to Gold Rush. He claims that his timeline works if you believe that what Ms. Johnson allegedly first told police--that the knock came at 9:30--was true. (Ms. Johnson disputed the offense reports of Mitchell and Easterling, claiming that she consistently said 10:00. 3 RR 75, 84, 85). Also, for the defense' time line to work, the jury must

have believed what Alford and Simpson first told police—that the three men arrived at Gold Rush at 11:30. Alford denied telling the officers this. 3 RR 135-137. Simpson admitted initially saying (on the 15th) the three men came in between11:15 and 11:30, but by the 17th, he had talked with Alford about it and upon reflection, it seemed closer to 10:45 or 11:00, and that is what he said in his recorded statement and at trial. 3 RR 157-158.

Significantly, the prosecutor was able to point out through questioning Brown that Brown had seen no televisions, no shotgun, no firearms in the van. 5 RR 148-149. If the brothers had committed the robbery with a third individual instead of Brown, and all left in the same van, where was the third actor when they got to Brown's house? Where was the other property? Brown claimed no knowledge of those items. 5 RR 148. The jury could have disbelieved Brown.

The two most significant times that are not contested are 10:36 and 11:54 The 911 call came in at 10:36, and neighbor Adkins stated she made that call almost immediately, certainly within five minutes after the van left the Johnson house. 3 RR 107-108. Regardless of when the robbers arrived at the Johnson home (9:30 or 10:00), they left just before 10:36, no earlier than 10:31.

Brown admitted cashing the check, and the uncontested time stamp on the video that shows Brown entering the bank is 11:54.09, and the time stamp on the

check shows it was cashed at 11:58 and the video shows him leaving at 11:59:44. 3 RR 192. SX 47 and 54.

After the trio left the Johnson house, it would have taken them, according to Detective Mitchell, from 11 to 20 minutes to get from Johnson's house to Gold Rush. 5 RR 53. So they would have arrived at Gold Rush between 10:42 and 10:51. On the 15th according to Mitchell's offense report, Alford said they arrived about 10:30 and Simpson said between 10:15 and 10:30. According to Alford and Simpson, from their trial testimony and their January 17th video statements and again at trial, the three men arrived between 10:45 and 11:00. 3 RR 115,134, 156, 159. No one coached them to change their time estimates. 3 RR 149, 159. Both Alford and Simpson stated the trio stayed at Gold Rush for about an hour. Brown estimated at no more than thirty minutes. The purchasing procedure involved weighing, analyzing and recording the purity and weight of each of 31 pieces of jewelry, completing paperwork regarding the identity of each seller and their ownership/right to sell, counting cash payments to two sellers and writing a check to the third. 4 RR 9-12.

Upon leaving the Gold Rush, the men drove to Citizen's bank about a mile and a half away on Gilmer Road, and arrived there at 11:54, cashed the time-stamped check at 11:58, and exited the bank at 11:59:44, according to the bank's

surveillance video. SX 54 3 RR 192. These times at the bank were never contradicted by the defense.

The jury could have taken the uncontested time span of 10:31 to 11:54 (one hour and 23 minutes), subtracted travel time from the Johnson house to Brown house (18 minutes), time from Brown house to Gold Rush (16 minutes), time from Gold Rush to bank (3 minutes, at least) and had a remainder of 46 minutes. In that 46 minutes, the Chester brothers would have had to drop off their third actor along with the televisions and firearms, stopped at Brown's house, walked in, awakened him, waited for him to put on his pants, brush his teeth, pick up the hoody that he was seen wearing at Gold Rush and at the bank, reentered the van, stopped at Gold Rush to wait as Simpson analyzed and weighed each of 31 individual pieces of jewelry and completed three sets of paperwork, reentered the van to travel to the bank.

The jury could have looked at the uncontested time span of 10:36 to 11:54 believed Alford's and Simpson's time estimates which they gave on the 17th, disbelieved Brown's time estimates, disbelieved Sandra Brown's alibi testimony, and concluded that Cordero and the Chester brothers were at Johnson's house together until 10:31, took 11-20 minutes to get to Gold Rush between 10:45 and 11:00, waited about an hour for Simpson to analyze, weigh 31 pieces of jewelry,

do the paperwork and pay them, and leave in time to go a mile and a half to the bank, arriving there in time to enter at 11:54.

A rational factfinder could have disbelieved the defense time line, accepted the State's time line, and found beyond a reasonable doubt that Cordero Brown was one of the three persons who invaded Ms. Johnson's home and took her jewelry threatening her and locking her in her truck.

Appellant has not shown any insufficiency of the evidence. Considering all the evidence in light most favorable to the judgment, giving due deference to the fact finding of the jury, a reasonable factfinder could have found all the necessary elements of aggravated robbery as charged in Paragraph A of Count I of the indictment. Appellant's second point of error should be rejected, and the conviction should be affirmed.

3) **Issue 3: The theory of alibi merely negates one element of the State's burden of proof; it's not a statutory defense that requires an instruction.**

Appellant's third issue is whether the trial judge erred in denying a request for a jury instruction on alibi. As he acknowledges in his brief, the prevailing case law on this issue was decided in 1998. *Giesberg v. State,Giesberg v. State*, 984 S.W.2d 245 (Tex. Crim. App. 1998)984 S.W.2d 245 (Tex. Crim. App. 1998). The Court of Criminal Appeals decided this issue and it is still good law.

None of the other cases cited by Appellant contradict the *Giesberg* opinion. The case Appellant relies on for his argument that denial of the alibi instruction is a "constitutional error of first magnitude," *Davis v. Alaska*, 415 U.S. 308, 317, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974), predated *Geisberg* by 14 years and dealt with a confrontation clause issue, not with an alibi defense. Furthermore, the Court subsequently "rejected this interpretation of the above-quoted language, observing that "Davis should not be read as establishing, without analysis, a categorical exception to the harmless-error rule. . . " *Carrero-Vasquez v. State*, 210 Md. App. 504, 522, 63 A.3d 647 (Md. Ct. Spec. App. 2013) quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 683, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)*Van Arsdall*, 106 S. Ct. 1431 and the Court thus held "that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to . . . harmless-error analysis." *Carrero-Vasquez (quoting Van Arsdall*, 106 S. Ct. 1431.)

The *Bursten* case cited by Appellant not only predated *Giesberg,* it also dealt with an instruction of following advice of counsel, not alibi, and is therefore not relevant. See *Bursten v. United States*, 395 F.2d 976, 981 (5th Cir. 1968).

The *Strauss* case does not support an argument for an instruction on alibi; *Strauss* was a tax-evasion case where the judge erroneously refused a requested instruction regarding corporate entity, resulting in reversal and remand, even when

the evidence was weak and based solely on the defendant's testimony. See *Strauss v. United States*, 376 F.2d 416 (5th Cir. 1967).

The *Bryan* case resulted in a new trial because the judge rejected opinion testimony of defendant's expert that the firearm was a pistol. *Bryan v. United States*, 373 F.2d 403, 407 (5th Cir. 1967). The State had to prove every element of the offense, including that the firearm was required to be registered. *Bryan* is distinguishable from the *Brown* case at hand by the fact that Bryan admitted having the firearm and admitted that it had not been registered. He was denied the opportunity to prove that the firearm was a pistol and not subject to registration. Brown did not admit being a part of the aggravated robbery. Whether or not he was among the trio of robbers was an element of the State's proof. As the *Geisberg* case held, "[E]vidence which constitutes a defense requires the accused to admit the commission of the offense, but to justify or excuse his actions so as to absolve him of criminal responsibility for engaging in conduct which otherwise constitutes a crime." *Giesberg*, 984 S.W.2d at 249. A person offering an alibi does not admit doing the act, he is attempting to negate an element of the State's proof—that he did the act. Thus alibi is not a defense.

The jury charge contained all the instructions this jury needed. Specifically, it contained all the elements of an aggravated robbery:

You must determine whether the state has proved, beyond a reasonable doubt that on or about the 14th day of January, 2013, in Gregg County, Texas, the defendant:

1. In the course of committing theft;
2. With the intent to obtain or maintain control of the property;
3. Intentionally or knowingly:
4. Threaten[ed] or place[d] Jera Johnson in fear of imminent bodily injury or death;
5. Used or exhibited a deadly weapon, to-wit: a firearm. CR 29.

If the jury believed his alibi evidence, they could not reasonably have found that the state proved the above elements. Brown denied committing theft. He denied being in Johnson's house. He said he was at home asleep. If the jury believed he was at home asleep, he could not have been at the Johnson house, committing theft, placing her in fear of imminent bodily injury or death, and he could not have used a deadly weapon to do so. His theory was that he was not there. If he was not there, a jury could not reasonably believe he had participated in the robbery. The issue was plain to the jury with no further instructions. Because Brown never admitted to being a part of the robbery, he was not entitled to any additional instructions on a defensive theory. Appellant's third issue should be rejected.

## 4) Issue 4: No abuse of discretion is proved by a trial court's admitting a photo of Brown with a gun.

Appellant alleged that the trial court abused its discretion by admitting a photograph of Brown with a gun. This exhibit came in during punishment.

The legislature has provided:

> (a) (1) Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

Tex. Crim. Proc. Code Ann. art. 37.07 (Vernon).

Appellant further argues that 404 (b) forbids the use of character evidence for purposes of proving action in conformity therewith. See Appellant's brief at 52. Clearly, however, Article 37.07, allows such a showing at the punishment stage.

Rule 403 isn't so clearly limited by article 37.07. The trial judge therefore still has the duty to determine whether an offered exhibit is more prejudicial than probative. The admission of evidence is a matter within the discretion of the trial court. *Roberts v. State,* 29 S.W.3d 596, 600 (Tex. App. Houston 1st Dist. 2000) *Roberts v. State*, 29 S.W.3d 596, 600 (Tex. App.—Houston [1st Dist.] 2000, pet.

ref'd) citing *Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990), on reh'g (June 19, 1991)). Accordingly, the trial court's admission of evidence is reviewed under an abuse of discretion standard. *Id.* As long as the trial court's ruling was within the "zone of reasonable disagreement," there is no abuse of discretion, and we must uphold the trial court's ruling. *Id.* (citing *Rachal v. State,* 917 S.W.2d 799, 807 (Tex. Crim. App. 1996); *Montgomery*, 810 S.W.2d at 391.)

The picture in question shows the defendant sitting in a bathroom pointing a gun with his right hand at the camera. SX 112. His left hand may have been supporting his right hand or may have been holding the camera. If his left hand was supporting his right hand and the gun, the camera could have been held by another person. His sister first testified that no one was behind the camera, then, on cross-examination, that she was not sure whether someone was standing behind the camera. 7 RR 32, 34. The questions by the State suggested someone else was behind the camera and within the possible line of fire, in support of the State's theory that this was a bad act. Defense counsel's questions seemed aimed at proving this was a "selfie," and endangered no one.

At a hearing outside the presence of the jury before the punishment phase began, the State argued for admission of words and pictures from Brown's Facebook page. The prosecutor argued for admission of the picture on grounds that it was "relevant to this case because this case involved a gun and we're about to

35

prove up two priors that are unlawfully carrying a weapon where he had [12] guns." 7 RR 11-12. He further argued that punishment is about character, and the picture (SX 112) was highly probative of his character when linked with other evidence from the guilt/innocence phase and his prior offenses. 7 RR 14. Defense counsel argued that the picture was not probative at all, not even relative to any punishment issue; it does not show a bad act—he was in his residence, holding a gun, pointed at the camera, and might not even be a real gun. 7 RR 12-13. He argued that the picture's "probative value was greatly outweighed by the prejudicial impact." 7 RR 14.

The judge weighed the probity and prejudice and ruled differently on the pictures from the way he ruled on the words. He considered the Facebook language more predjudicial than probative. But as to the picture without the language, the judge ruled it admissible, implicitly finding the picture more probative than prejudicial. 7 RR 15-16. His decision was certainly within the zone of reasonable disagreement, and therefore is not an abuse of discretion. Appellant's fourth issue should be rejected.

### 5} Issue 5: The trial court did not abuse its discretion by admitting a 911 audio tape, even though it was not disclosed before trial.

Appellant avers in his fifth issue that the trial court erred in admitting the 911 tape of Claire Alford's call to police in an attempt to find out if she might have purchased Ms. Johnson's stolen jewelry.

A decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *Hardin v. State*, 20 S.W.3d 84, 90 (Tex. App.—Texarkana 2000, pet. ref'd). The issue is whether the court acted without any reference to any guiding rules or principles. *Id.* Just because a reviewing court might have come to a different conclusion does not "demonstrate such an abuse." *Id.* (citing *Montgomery*, 810 S.W.2d, 391-92(opinion on reh'g.) If a trial court's decision is "within the zone of reasonable disagreement," it is not reversible. *Id.*

In *Oprean v. State*, a case cited in the appellant's brief, the Court of Criminal Appeals held that "Evidence willfully withheld from disclosure under a discovery order should be excluded from evidence." *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006). The Court went on to hold:

> When reviewing a trial judge's decision to admit or exclude evidence, an appellate court must determine whether the judge's decision was an abuse of discretion. Unless the trial judge's decision was outside the 'zone of reasonable disagreement,' an appellate court should uphold the ruling. When a trial judge makes findings of fact 'based on an evaluation of credibility and demeanor,' an 'appellate court should show almost total deference' to those findings. And when the trial judge fails to enter written or oral findings of fact, an appellate court will 'view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record.'*Id.*
> The *Oprean* opinion also reminded us of the *La Rue* case, in which the Court

of Criminal Appeals studied three situations in which the Court failed to find

willful disobedience of discovery requirements after a trial court found such

disobedience and excluded the DNA evidence offered by the State. *Id.,* (citing (Tex. Crim. App. 2004)*State v. LaRue*, 152 S.W.3d 95-99 (Tex. Crim. App. 2004)).

In the first situation, a prosecutor, anticipating reassignment of the case to another prosecutor, failed to comply with a discovery order. The Court of Appeals found his inaction "'willful' with respect to the conduct itself," but found in the record no evidence that he "intended to violate the order or harm the defense." *Id.*

In the second situation, defense counsel told prosecutor he needed the evidence immediately because he was going out of town, and the prosecutor faxed the documents to defense counsel on the day he left town. This tactic the trial judge determined was "gamesmanship," which cost the defendant a fair trial. The Court of Criminal Appeals disagreed, finding it unreasonable to infer a "strategic and purposeful effort to thwart the defense in its preparation of its case." *Id.*

In the third situation, the prosecutor objected to the grant of a continuance, which the trial judge found to have demonstrated "the willfulness of the conduct in withholding the evidence. . . ." Once again, the Court of Appeals disagreed with the trial court, stating that the State's objection "was in no way relevant to the nature of the State's conduct when it violated the discovery order."

The *LaRue* Court then ruled that the prosecutor's failure to disclose DNA evidence did not demonstrate that the prosecutor "acted with the specific purpose of disobeying the court's discovery order.

Likewise, a review of the record in this case shows no such intent to disobey the court's discovery order.

The fact of Alford's phone call to police and the timing of that call did not become relevant until defense counsel made an issue of it on cross-examination. The jury was left with a false impression that Alford was lying about calling the police immediately after she heard about the robbery.

The following excerpts from her testimony regarding that call suggest reasons for the State's failure to disclose the 911 call recording before trial and their reasons for wanting to admit it after she testified.

1.     The prosecutors and defense counsel all knew, based on an offense report and her recorded interview, that she had called police about her purchase of gold that might have been from the robbery.

2.     The State allowed discovery of her recorded statement to police and the offense report, but did not provide the recording of her 911 call.

3.     Her words "now that I remember I called 911" indicate that she might not have previously told the prosecutors that it was a 911 (recorded) call.

4.     When the defense attorney's questions challenged her credibility, the State felt a need to rehabilitate that credibility.

5.     Once the prosecutors learned—during the trial--that she had actually dialed 911, they began to look for a recording of her 911 call.  They

had not sought to locate a recording until they realized she had actually dialed 911.

6.    The time at which Clare Alford called the Sheriff was not a necessary element of proof in this trial; it happened hours after the Brown cashed the check, proving his involvement.

The following excerpts from the record deal with this issue:

BY MR. BOTTO:  Q. You were saying you heard that a lady was tied up, and what were the actions you took when you heard that?
A. Well, about 5 o'clock I went to leave like I normally do and I make my run to the bank. The radio station was on The Ranch. They were doing a Gregg County deal on the radio that said that there was a very terrible crime that had happened with an elderly woman, 77 years old, where a lot of gold was stolen. And the nature of the robbery was -- they gave the time -- the nature of the robbery was heinous, it was very, very terrible, and they said anybody who knows or has any leads towards this please contact Gregg County.  At the time they did not say the race of the young men, so I had no idea. All I did was do the proper thing as somebody who cares, and I called the Gregg County
Police Department and I said, "Could you please tell me the color, the race of the young men that you think is involved in this robbery?" And once they told me, and I said, "Well,
[148]
three young men came into my store about that time," and  then that's when the investigation started.
Q. So you did call it in?
A. Yes.
3 RR 147-148.

BY MR. CONE:
Q. Now, when is it that you heard this story on the radio?
A. About 5 o'clock.
Q. 5:00 p.m.?
A. 5:00 p.m. that day.
Q. On January 14th?
A. Yes, sir.
Q. And so you felt like you realized you had to do your duty and do something at that point; is that correct?
A. Yes, sir.
Q. Called them the next morning?
[151]
A. No, I called them that night.
Q. Who did you call?

A. I called -- well, I didn't know because they didn't have the number on the radio -- on the advertisement on the radio they didn't have the number to call, so I made contact with three or four different departments here at Gregg County before someone actually called me back. And I just let each department know as they were transferring phone call to phone call that I felt like I needed to speak to someone so they could tell me the race of the guys that did the robbery. And then from that point to let them know that I felt like the articles of question and the people that may or may not have done that had been in my store earlier that day. And that all went down until probably 8:30, 9 o'clock at night while I was having dinner at Texas Roadhouse. We were contacted that night by Officer Mitchell on the phone.

Q. Okay. You actually come to see anybody or you just telephoned?

A. This was all on the telephone. They visited our store the next day. First thing that morning when we got open Officer Mitchell showed up to start investigating.

Q. Who did you talk to on the night of the 14th; do you remember?

A. I just remember probably Googling Gregg County

[152]

Sheriff's Department and then probably -- I think I have --may have even called -- now that I remember I called 911. And then once I called 911 and let them know that it wasn't an emergency but it was -- what it was about, then they said, "Well, let me transfer you to this department." And then from there they took my name and number down, and then that's when we were called back.

Q. All right. Thank you, ma'am.

A. You're welcome.

In the next day's trial record, this exchange occurred:

BOTTO: Judge, we have the 911 phone calls that Claire Alford made on January 14th, 2013. These come in at 5:48, but they reference earlier calls that she might have made to 911. This, I believe, comes from the Sheriff's office, and it's the only recordings we have. Obviously, the State wants to put that into evidence to clear up the false impression that's been left with the jury at this point, and we believe it would be rebuttal if -- sorry, Judge, we believe it would be rebuttal evidence at this point also. To do that, Mr. Cone has asked me -- I asked Mr. Cone if I needed Claire Alford to authenticate her voice, and he said -- he told me no but that we would need someone to authenticate the actual call with the time, dates and stamps and all that. So I'm working on tracking that person down right now. I'm not sure who that might be; we're trying to figure that out. So I don't intend to put

[7]

it in right now, but we are going to try to work that up.

THE COURT: We can go forward then with other evidence until we get to that point.

MR. BOTTO: That's what I think, Judge.

THE COURT: Okay. I thought we had to take it up now. Do you want to say anything at this time, Mr. Cone?

MR. CONE: I'm going to have an objection as to the timing issue. I understand they just got it, but the standing order of the Court is we should have all discovery well before trial, and we're going to object on that basis. But I can wait until they offer it.

THE COURT: All right. I'll make a ruling when it's offered then.

5 RR 6-7.

Later that morning of the trial, this exchange occurred between the attorneys and the judge:

MR. BOTTO: Judge, the sponsoring witness for State's Exhibit -- what will be, I believe, 102, which is the 911 phone call from Claire Alford, will be Jennifer
[59]
Portwood. And she's available and ready to testify as soon as we're done with Mr. Mitchell. Like I said, Judge, we think we're allowed to put that in and would ask the Court to allow us to.

MR. CONE: And our objection is -- and I understand this was not given to the State until we broke for lunch today, I understand that's when they actually received it -- however, these are 911 calls about this particular offense made on January the 14th, 2013. The first time we heard of them was right after lunch -- I have listened to the videotapes. The State provided those so I could listen to them during the lunch break.

But the timing issue, Judge, we object. I think it's inappropriate to introduce evidence at this point.

THE COURT: And your response to the timing issue, Mr. Botto?

MR. BOTTO: Judge, I'm going to let Mr. Parker respond.

MR. PARKER: Your Honor, as you know, we do our best to turn each and every piece of evidence over. I don't think any of the parties anticipated an ancillary attack on a witness for a different matter than what we thought the heart of the matter would be. The heart of the
[60]
matter was how we thought, and I think every party has felt, the heart of the matter would be what time the individual showed up to do the exchange of the gold -- property, which I think would end up being the heart of the arguments coming up. The fact that she made the 911 phone call six hours, seven hours later and contacted the police as listed in the offense report since then, I just don't think anybody thought that would turn

into an issue. Mr. Cone rather successfully got into it with her, but when, in fact, the truth is she did call the police and we have that.

MR. CONE: And I guess that's the point that -- from our direction the Defense is taking is that I cross-examined her on that rather heartily, but then I had no information that she had indeed called.

THE COURT: I thought that was in an offense report?

MR. BOTTO: Judge, I can say this, in Claire Alford's video statement she mentions that she heard at 5 p.m. the Ranch radio, that she then called in because of it. And that's in the video statement that she gave to Mr. Mitchell, and I know Mr. Cone has that.

MR. CONE: I heard that, but I had nothing to actually confirm that until we get this. Obviously, we would have taken a slightly different tactic on that issue.

[61]

I think that prejudices the defendant and makes it inappropriate letting it in.

MR. PARKER: If I may, Your Honor. It certainly hurts the State at this point because it made our main witness look like a liar on an issue that's not important to the case.

THE COURT: I'm going to overrule the objection and allow the evidence to come in.

5 RR 58-61

When that sponsoring witness was called, the prosecutor elicited this

testimony, followed by defense counsel's cross examination:

Q. What were you asked to do today?
A. I was asked to search for calls that had came in on -- if I can look at my notes -- January the 14th, 2013, between 4:00 and 6:30 in the afternoon.

5 RR 78

Mr. Cone:
Q. You got the request today to try to retrieve them; is that correct?
A. Yes, sir.
Q. Where did that request come from?
A. From Chris Miller, the district attorney investigator.
Q. And you retrieved them and you turned them over to the DA's office, correct?
A. Yes, sir.

43

Q. I assume -- about what time today did you get that to them; do you have any idea?
A. Earlier this morning.
Q. Were you aware the first time I ever heard of those calls was today during the lunch hour? You wouldn't know that, would you?
A. No, sir.

5 RR 82

When Prosecutor Parker offered State's exhibit 102, Mr. Cone renewed his objection, and the Court overruled it and received the exhibit. 5 RR 80.

The judge did not err in admitting the recording of the phone call Alford made to the Sheriff's office. The State had provided discovery, which including an offense report and the recorded statement of Clare Alford to the Sheriff's office. Both of these indicated that she had made a call to the Sheriff's office. Mr. Cone acknowledged at one point that he had heard her say that in the materials that were provided. 5 RR 61.

The recording had been in the possession of the Sheriff from January 14, 2013, but the prosecutors did not see a need to provide such a recording, even if they had known all along of its existence. It was not Brady material—it contained nothing exculpatory. It was not necessary to prove their case. They did not foresee having to prove the time Alford called. If they had thought about it, they would have perceived the time of her call to be immaterial. It became material only because the defense attacked a very

44

important witness on this inessential point, possibly creating doubts in jurors' minds of Alford's credibility.

The record of this case contains nothing that shows intent on the part of the prosecutors to violate the standing order of discovery or to harm the defendant's case. The State requests that this Court defer to the findings of the trial court, because he relied on the demeanor of the prosecutors to make his ruling. There being no findings of fact or conclusions of law, the State further requests that this Court infer that the trial court made findings that support his ruling. This issue should be decided in favor of the State and the appellant's fifth issue rejected.

## CONCLUSION AND PRAYER

As explained in the foregoing pages, none of Appellant's issues has merit. For the foregoing reasons, the State prays that this Court will reject each of Appellant's issues and affirm the Trial Court's judgment and sentence.

Respectfully Submitted,

/s/ Zan Colson Brown
Texas Bar No. 03205900
Assistant District Attorney
101 East Methvin St., Suite 333
Longview, TX  75601
Telephone: (903) 236–8440
Facsimile:  (903) 236–3701

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing has been forwarded to all counsel of record by certified mail, return receipt requested and/or facsimile to:

Mr. Lew Dunn
P.O. Box 2226
Longview, Texas 75606

this 21st day of April, 2015.

/s/Zan Colson Brown
Assistant District Attorney

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing document complies with Texas Rules of Appellate Procedure, Rule 9 (2012) regarding length of documents, in that exclusive of caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix, it consists of 10,875  words.

/s/Zan Colson Brown
Assistant Criminal District Attorney